Filed 8/19/21  P. v. Guerrero CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD GUERRERO et al.,<br><br>    Defendants and Appellants. | H045752<br>(Santa Clara County<br> Super. Ct. No. 215585) |

## I.    INTRODUCTION

Defendants Richard Guerrero and James Guerrero are brothers and fellow Norteño gang members who shot and killed Eric Mendoza in a drive-by shooting on April 3, 2014.[1]

Defendants appeal after a jury found them guilty of first degree murder (Pen. Code, § 187; count 1)[2] and active participation in a criminal street gang (§ 186.22, subd. (a); count 2).  The jury also found true the allegations that defendants committed count 1 for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)) and that a principal personally and intentionally discharged a firearm and proximately caused death

---

[1]  Because defendants share the same last name, we use their first names to refer to them individually and "defendants" to refer to them collectively.  Likewise, we refer to David Martinez and Isaac Martinez by their first names.

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

in the commission of count 1 (§ 12022.53, subds. (d), (e)(1)).  The trial court sentenced each defendant to aggregate terms of 53 years to life.

Defendants contend that insufficient evidence supports the gang crime and enhancement because there is not substantial evidence connecting defendants' subset gangs with the Norteño gang; the trial court violated Evidence Code section 352 through its admission of cumulative and prejudicial predicate gang acts evidence; the court erred when it failed to define "in association with any criminal street gang" in its instructions to the jury; the court erred when it failed to instruct the jury on heat of passion voluntary manslaughter and unreasonable self-defense; the court erred when it did not instruct the jury that the prosecution had to prove the lack of provocation and unreasonable self-defense in order to establish the malice element of murder; counsel were ineffective in failing to request an instruction on third-party culpability; and the court committed several sentencing errors.

In addition, James contends that the trial court improperly admitted a hearsay statement as a declaration against penal interest; the statement's admission violated his federal constitutional rights to a fair trial and a jury trial; and the court improperly allowed David Martinez to testify about a statement Richard made to Isaac Martinez that Isaac relayed to David under the coconspirator statement hearsay exception.

For reasons that we will explain, we determine that the trial court erred when it failed to stay the three-year terms imposed for defendants' active participation in a criminal street gang.  We reject defendants' remaining claims.  Accordingly, we order the judgments modified to stay the three-year terms imposed on count 2 and affirm the judgments as modified.

2

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Prosecution Case*

#### 1. Background

In 2014, Eric Mendoza lived with his girlfriend, their infant son, and his girlfriend's family at the Valley Palms Apartments at Waverly and Lanai Avenues in San Jose. Mendoza worked nights as a janitor. Mendoza was not involved in gang activity and did not have problems with anyone living at Valley Palms, although he "would not back down from people staring at him."

Valley Palms was "a Sureño-affiliated apartment complex" with "[p]retty frequent" gang activity and "[b]ack and forth from Sureños and Norteños." The complex was in a Sureño neighborhood with occasional drive-by shootings and "Norteños going around the block."

#### 2. Charged Incident

On April 2, 2014, Mendoza went to work around 5:30 p.m. Mendoza called his girlfriend a couple of times to check in and also sent her a text message at 11:30 p.m.

On April 3, 2014, a resident on Lanai Avenue was awakened around 3:20 a.m. by the sound of five or six gunshots. The resident heard two pops, a four or five second pause, and then three or four more pops.

A neighbor was awakened by the sound of gunshots at around the same time. She heard four to five gunshots in a row followed by a loud bang like a big crash.

San Jose Police Officer Kyle Babineau responded to a call for service in the area, but he did not see anything unusual. It was quiet.

Mendoza's girlfriend woke up around 4:00 a.m. to feed the baby and noticed that Mendoza had not come home. The girlfriend called and sent text messages to Mendoza but he did not respond, which was unusual. After 40 minutes of calling and texting Mendoza with no response, the girlfriend went to look for him and found his car at the intersection of Lanai Avenue and Denali Way, which was around the block from their

3

apartment. Mendoza's car was "crashed and shot." The girlfriend did not see Mendoza and she was afraid to get out of her car to look because it was in "a bad area . . . especially at that time of the day." The girlfriend drove back to her apartment complex and picked up her father and sister to go with her to look for Mendoza.

The group found Mendoza's body inside his car. Mendoza was tilted on his side with his head on the passenger seat. Mendoza's face was bloody. Mendoza's car had a flat tire, its headlights were on, the doors were locked, the engine was running, and some of the windows had gunshots in them. The girlfriend's sister called 911.

Officer Babineau responded to the scene at approximately 5:28 a.m. Officer Babineau observed a red car crashed into another vehicle parked on Denali Avenue. The back window of the red car had a bullet hole and was shattered. There were also bullet holes in the driver-side rear window and the passenger-side rear window. Mendoza was pronounced dead at the scene.

An autopsy revealed that Mendoza was killed by two gunshot wounds. One gunshot entered Mendoza's left upper back and traveled to his left scapula, which fractured. The second gunshot entered Mendoza's left upper arm, traveled through his arm, and perforated his ribs. The bullet and jacket separated, and the bullet's core perforated Mendoza's left lung, thoracic aorta, and right lung before traveling to Mendoza's right armpit. The jacket perforated a vertebra and came to rest in Mendoza's right lung. Blood collected in the space between Mendoza's chest wall and lung. Mendoza had 0.035 micrograms of cocaine metabolite in his blood.

### 3. Police Investigation

The area around Lanai Avenue and Denali Way was known to police as "a heavily gang area, mostly Sureños."

Police located four .40 caliber spent shell casings at the crime scene and one bullet trapped in the doorframe of Mendoza's car. All of the shell casings were fired from the

4

same gun. Based on the casings' class characteristics, the casings could not have been fired from a Glock pistol, nor could they have been fired from a .38 caliber pistol.

Police collected video surveillance footage from several homes in the neighborhood. The footage showed a Jeep Grand Cherokee repeatedly traveling back and forth on Lanai Avenue between 3:02 a.m. and 3:33 a.m. The Jeep's sunroof had been "replaced with some kind of metallic [*sic*]." The Jeep initially had its headlights on, but beginning at 3:26 a.m., the footage showed the Jeep traveling on Lanai Avenue with its lights off.

At 3:34:04 a.m., the video footage showed the Jeep traveling northbound on Lanai Avenue with its lights off. Thirty seconds later, the footage showed the Jeep and Mendoza's vehicle both traveling southbound on Lanai Avenue. The Jeep approached Mendoza's car from behind with its lights off and then drove almost side by side with Mendoza's vehicle; Mendoza's car was slightly ahead of the Jeep. At 3:34:39 a.m., the video footage showed a flash next to the Jeep as it drove in Mendoza's blind spot. It appeared that the flash was "a discharge of a firearm towards the victim's vehicle." A detective viewing the footage saw "a second muzzle flash" at 3:34:40 a.m. "where someone [was] shooting from the suspect vehicle towards the victim vehicle."

On April 4, Samuel Hernandez called the police stating that he had information about the homicide. The police interviewed Hernandez the next day. Hernandez was arrested after the interview for an attempted murder unrelated to this case.

Based on the information received from Hernandez, the police located a black Jeep Cherokee close to Hernandez's residence. The Jeep's sunroof "had been plated over with a piece of sheet metal."

Police searched the Jeep, finding DMV paperwork that "show[ed] a transfer of the vehicle to an Isaac Martinez." Defendants' grandparents told the police that "sometimes [James] would drive the [Jeep] and sometime[s] Isaac would drive the vehicle, but they . . . bought the vehicle together." Three knit caps were found inside the vehicle, two

5

of which had Oakland Raiders logos.

### 4. Samuel Hernandez's Testimony

Hernandez lived with his girlfriend, their son, his girlfriend's family, and David Martinez. Hernandez had been good friends with David for years; they committed crimes together and David was dating Hernandez's girlfriend's sister. Hernandez knew David's brother, Isaac Martinez, but they were not close.

On April 3, Isaac called Hernandez at approximately 10:30 or 11:00 a.m. asking to speak to David, who did not have his own cell phone. Hernandez handed David his phone and Isaac and David spoke for a few minutes. Approximately 30 minutes later, Isaac arrived at the house. Isaac was driving a black Jeep Cherokee. Isaac and David went into the backyard for 20 to 30 minutes. Isaac left in the Jeep for a couple minutes, but then returned, parking the Jeep across the street. David told Hernandez that he and Isaac were going to their cousins' house, which normally meant "Richard or James'[s] house." David and Isaac left in David's car, leaving the Jeep behind. Hernandez had seen both James and Isaac drive the black Jeep.

On April 4, Richard called Hernandez around 10:00 or 11:00 a.m. and asked to speak to David. Hernandez handed the phone to David and walked away. When David got off the phone, he told Hernandez that he was going to clean the Jeep. David was wearing gloves and had wipes in his hand. Hernandez walked to the Jeep with David and asked why he was cleaning it. David responded, " 'Because that's what they told me to do.' " David said that his cousins "murked" somebody in that car, which is why the Jeep was left at Hernandez's and David's house. "Murked" means killed. David told Hernandez that Isaac had not been involved and that it was Richard and James. David also mentioned that the murder had been in the news.

David opened the passenger seat and wiped down the dashboard, steering wheel, front passenger door handle, and front passenger window. David also looked for shell casings.

6

Hernandez went inside and read online that there had been a murder the day before on Lanai Avenue, which Hernandez knew was a Sureño neighborhood. Hernandez told his girlfriend about it, who was shocked. Based on their conversation, Hernandez decided to call the police, which he knew would "burn [him] as a Norteño for the rest of [his] life." Hernandez met with the police the next day.

Hernandez had seen Richard carry a loaded handgun a few times. Richard told Hernandez that it was "a Glock .40" and that "if anyone is going to use the gun, it's him because it's his."

Hernandez and Richard spoke after they had both been arrested and discussed a text message that Richard had sent to Hernandez. Richard asked what the text message said and Hernandez responded, " 'I don't know exactly, but I think it had something to do with you mentioning cleaning the car.' "

Hernandez had sustained juvenile petitions for battery and vandalism in 2008 and 2009 and convictions for felony auto theft and resisting arrest in 2010. He had also been convicted of escape and giving false information to the police.

At the end of his police interview about this incident, Hernandez was arrested for attempted murder in an unrelated case. Hernandez was charged with attempted murder with gang allegations in the unrelated case and subsequently pleaded guilty or no contest to assault with a firearm and admitted the gang allegation. Hernandez had not yet been sentenced and was facing 14 years. The district attorney could terminate the plea agreement in the unrelated case if Hernandez did not testify truthfully in this case.

### 5. David Martinez's Testimony

David Martinez is James's and Richard's cousin and Isaac Martinez's younger brother. In 2014, David went to his cousins' cottage on his grandmother's property on South White Road every day. David had a strong friendship with Richard; he was not as close to James but his relationship with him was good. David was "pretty close" to Isaac. David lived with his girlfriend, her family, and Hernandez, who was dating David's

7

girlfriend's sister.

David cleaned the black Jeep used in the murder. The Jeep belonged to Isaac and James. Isaac called David the morning of the murder and told him he was coming over. He arrived in the Jeep and parked in the driveway. As they were smoking some of David's marijuana, Isaac told him "what happened with the car," which was based on secondhand information. Isaac said that Richard had asked him to ask David to clean the car. Isaac said that otherwise he would get rid of it. David told Isaac that he would take care of it because he did not want Isaac driving the car. David had Isaac move the Jeep to the street and then took Isaac home in his own car.

David cleaned the Jeep on the street the next day. Wearing gloves, David wiped the dashboard, the steering wheel, the seatbelts, the seats, the door handles, and the emergency break with baby wipes. He also made sure there were no shell casings anywhere, picked up some of the trash, took down a shirt that was on the passenger window, and "dumped the ashtray . . . in case there's . . . DNA." Hernandez was there but did not help.

During a conversation the day after the murder, James told David that after Richard fired the gun, James took off because he got scared that people would see.[3]

The day after David cleaned the Jeep, Richard spoke with David directly, confirming that David had cleaned the Jeep and asking for details about what had been cleaned.

At some point, Richard told David "what had happened in that Jeep." Richard said that he and James had been drinking with a friend. After they dropped the friend off,

---

[3] David gave conflicting statements during police interviews regarding what James told him. In his first interview, David said that James admitted that he was driving the car during the homicide. In a subsequent interview, David said that he did not remember James saying anything to him and that Richard had told him what happened. During follow-up questioning, David said that James told him he was driving the vehicle during the shooting.

they went to a liquor store "at the corner before you enter Lanai," but it was closed. Richard and James then went to "the back streets [by the liquor store] to see if they can find anyone, anyone being Sureños." James was driving. Richard told David that they did not find anyone, but "as they were coming out, . . . they see a car . . . at [a] stop sign, far away." As "he's coming up, . . . he stops right there, and Richard said he sees him reach down, and so he started shooting at him because he thought he was reaching for a gun." Richard stated that "[w]hen it went forward, that car takes off and comes next to 'em and looks at 'em, and that's when [Richard] said that he saw him reaching down there, . . . down to the bottom of [his] feet, and -- so that's why he started shooting at him." Richard told David that "when the other driver pulled up next to the car he was mugging Richard, [*sic*] pulled out his gun and started shooting at him." "Mugging" means giving a dirty look. Richard said that he thought the driver had a gun or a knife but he did not tell David that he saw a weapon. After Richard shot him, "[t]hey took off."

David subsequently told Hernandez "what [he] knew" because he thought he could trust him.

Two or three days later, David gave Richard a ride to a house "somewhere in the area of Story and White [Roads]." Richard directed David where to go. David did not know who lived there and had never been there before. Richard was inside the house for about five minutes. Richard later told David that he had dropped the gun off with "Shorty." David had seen Richard with a .40 caliber semiautomatic handgun once about a month before the murder.

Within about a week, the police arrested David for being an accessory to Mendoza's murder. He was interviewed by the police immediately after his arrest and reinterviewed about eight months later when he decided to cooperate with the prosecution.

While David was in jail, Richard told him that Shorty thought he was being

9

watched.  Richard thought Shorty was nervous because Richard dropped the gun off with him.

David testified that in August 2013, he had gone to Walnut Tree Park with Hernandez to look for Sureños.  When people started throwing gang signs and reaching for their waistbands, Hernandez fired three shots with his .22 caliber gun while David was standing next to him.  David was charged with attempted murder and pleaded guilty to assault with a firearm and admitted a gang allegation.

In this case, David pleaded guilty to being an accessory after the fact.  He was facing a maximum of seven years but the agreement could "go[] away" if he were not truthful in his testimony in this case.

In May 2009, when he was 14 years old, David was arrested for possession of a dangerous weapon.  David was arrested again for possession of a dangerous weapon in 2011.  David was convicted of misdemeanor battery in 2016.

### 6.  Cell Phone Evidence

During his police interview, Hernandez identified an incoming call on his cell phone from Isaac at 10:55 a.m. on April 3 and an incoming call from Richard at 1:25 p.m.

Cell phone records reflected that Richard called Hernandez at 1:25 p.m. on April 3 and then placed three calls to Isaac between 1:26 and 1:27 p.m.  The records also showed that Richard called Hernandez at 12:24 p.m. on April 4, "[b]efore David cleaned[.]"

On April 6, Richard sent a text message to Hernandez's phone at 10:55 a.m. stating, "A Locs [*sic*], can Italk [*sic*] . . . to Wyno [*sic*]. . . .  It's important."  David's "nickname" was "Wino"; Hernandez's gang monikers were "Locz," meaning crazy, and "Manos," meaning hands because he liked to fight.  Richard sent a second message to Hernandez's phone at 11:11 a.m. stating, "Didu whip it down HELLA good?"  The police interpreted "whip" as "wipe."

### 7. Police Searches of Residences

Police searched Hernandez's and David's residence. They found three Raiders jerseys in a bedroom closet and eight nine-millimeter rounds in the trash. In the same bedroom, "Norte, Most Deadly" was written on a television stand. A red bandana was found in a different bedroom. A polo shirt and several disposable wipes were found in a trash can in the backyard.

Police searched defendants' grandmother's property on South White Road where defendants lived. In one of the two cottages on the property, police found a shirt with a Sharks logo, a Raiders jersey, a glass pipe, "a cut-off ankle monitor," a belt buckle, and mail addressed to James. "VMF" and "Norte" were etched into the monitor. The letter "N" was inscribed on the belt buckle in gothic script. A small silver pistol, a credit card in Richard's name, and a document that appeared to be a set of gang rules were found inside a safe in a camper on the property. Police also found digital scales, a semiautomatic pistol, a magazine containing six rounds, and two loose rounds in the camper's safe. The pistol's serial number had been removed. "VNG" was written on a wood plank in the backyard.

### 8. Gang Evidence

San Jose Police Officer Gabriel Cuenca testified as an expert on criminal street gangs and criminal street gang members in Santa Clara County. Officer Cuenca was assigned to investigate Norteño crimes when he was a detective in the gang unit for three years. Officer Cuenca had responded to over 100 gang-related crimes, had interviewed gang members in prison, and had completed over 75 field interviews.

Officer Cuenca testified that gangs are criminal enterprises whose purpose is to commit crimes, such as narcotics sales, vandalism, burglaries, assaults, and murder. Gangs use the money to buy weapons, pay organizational taxes, and purchase high-ticket items for recruitment. Gangs use the fear of retaliation to prevent the flow of information to law enforcement. Gang members achieve status in their gangs by committing acts of

violence; the more violent the crime, the greater the gang member's status. Gang members also achieve status when another gang member observes the criminal activity and relays the crime's commission to other gang members. The commission of crimes by gang members together benefits the gang because it unites the gang members more closely.

To determine whether someone is a gang member, Office Cuenca reviews the subject's police contacts to see who the subject has been stopped with, if the subject made any statements, if the subject wore gang clothing, and if the subject had gang tattoos or other gang indicia.

### a. *The Norteño and Sureño gangs*

Officer Cuenca testified that the Norteño gang originated from the Nuestra Familia prison gang because "the[] prison gang members needed a sphere of influence outside of the prison system." In April 2014, there were over 1,000 Norteños. Norteños are commonly from Northern California. Norteños identify with the color red, the letter "N," the number 14, and the Huelga bird. Norteños display the number 14 in tattoos, hand signs, and vandalism. The 14 bonds "are laws or rules that are set forth by the Nuestra Familia, which is the governing body for Norteños and Northerners on the street level."

In Officer Cuenca's opinion, Norteños have individually and collectively engaged in a pattern of criminal gang activity. Officer Cuenca opined that the Norteños's primary activities are theft, burglary, shooting from a motor vehicle, illegal possession of firearms, assault with a deadly weapon, and murder.

Norteños and Sureños are rivals. The Sureño gang originated from the Mexican Mafia prison gang and its members are commonly from Southern California. Sureños identify with the color blue, the letter "M," and the number 13. Norteños outnumber

12

Sureños in San Jose, but there are still a significant number of Sureños in the city who control small areas, such as apartment complexes or blocks.

There are often assaults involving Norteños and Sureños in Sureño-controlled areas. A Norteño does not need a directive from a higher-ranking member to assault or murder a Sureño. Rather, "the rule" is that when a Norteño sees a rival gang member or perceives disrespect, he or she is supposed to take action and "check that person" by assaulting or shooting them.

There are various "factions" under the Norteño umbrella that identify with a particular city or neighborhood. The factions operate together, are interconnected, and work together. "[T]hey are part of a much larger group than just . . . what is called a common criminal street gang." The factions often have their own signs and symbols but they also identify with the color red and the number 14. In the county jail, the subsets unite under the larger Norteño group. Officer Cuenca had seen kites, or inmate notes, with the "names and rosters of particular Northern or Norteño groups and the subsets are written in those in [the] collective."

### b. *The VNG and VMF subsets*

The VNG subset, or the Varrio Norte Grande, is centered in the northeast side of San Jose near McKee and White Roads. In 2014, VNG had at least 10 members. VNG members identify with the letter "A," including the Atlanta Braves's "A" and the Oakland Athletics's "A," and the number 864, as well as common Norteño symbols such as XIV or four dots. The VNG fraternizes with other Norteño gangs. In Officer Cuenca's opinion, the VNG was a Norteño gang on April 3, 2014.

The VMF, or the Varrio Meadow Fair, "is another San Jose subset." The VMF is centered around the Meadow Fair Park neighborhood of San Jose and identifies with the letter "M" and the number 863. The VMF had approximately five members in

13

April 2014 and was in continuous existence for three years up to and including April 3, 2014.

The VNG and the VMF are "very closely aligned." VNG and VMF members "fraternize," are often seen together, and sometimes use each other's symbols by wearing apparel with the other subset's symbol on it. "[T]hey are almost like sister gangs where the members are very close to each other, often associate together, attend each other's funerals[,] and so forth."

### c. *Gang evidence involving James*

James had a sustained juvenile adjudication for felony attempted second degree burglary (§§ 664, 459, 460, subd. (b)) committed on October 5, 2008.

On October 15, 2008, James was arrested for kicking another student at Evergreen Valley High School. James had learned that the victim was disrespecting or challenging him. Elias A. punched the victim and then James kicked the victim while he was on the ground. James told an officer after the incident that it was "better to jump him before he got jumped." James denied that he was a Norteño, stating that "cops tried to say he was." James admitted that people would assume he was a Northerner based on "who he hung out with." At the time of the offense, Elias had a red bandana in his rear pants pocket and wore black shoes with red designs. "408," "Norcali," and "Bay Area" were written on Elias's shirt and Elias's backpack had " 'S.S.S.J.' " written on it, which stands for "South Side of San Jose." One of the backpack's straps had one dot on it and the other strap had four dots. The victim had writings in his backpack associated with the Sureño gang, including "writings of 'Lanai.' "

On November 14, 2009, James was arrested for a probation violation for breaking off his electronic ankle monitor. James was located behind a church on South White

14

Road with several other individuals. James was "on full gang-ordered probation for [attempted burglary]."

James had a sustained juvenile adjudication for felony vehicle theft (Veh. Code, § 10851, subd. (a)) committed on February 23, 2010. Santa Clara County Sheriff's Deputy Henry Rocha testified that at approximately 6:54 p.m. on February 23, 2010, he activated his patrol car's emergency lights to stop a vehicle traveling with its headlights off. The car failed to stop and as it made a righthand turn, "all occupants of the vehicle jumped out of the car and began running." There were approximately seven occupants. Deputy Rocha chased the driver, later identified as James, but lost sight of him. James was found hiding in some bushes. The car had been reported stolen. The police also located a suspect named Paul and a suspect named Isaac.

On March 5, 2014, James was in a vehicle stopped for expired registration tags. A photograph of the car stop shows James wearing an Oakland A's hat. A red and black Cincinnati Reds baseball hat and a folding knife were found inside the car. Angel Ledesma was a passenger in the vehicle. Ledesma had a tattoo of "RIP Armando Herridia" with some dates. Herridia had been murdered and Officer Cuenca had seen Herridia's name tattooed on VNG and VMF members. Officer Cuenca had seen Ledesma associating with VNG members. The vehicle's driver, Eric Zarate, had been seen by police at a memorial for a suspected gang member the day before the car stop. According to Officer Cuenca, the Zarate family is closely aligned with the VMF.

Officer Cuenca testified that James had a tattoo of "Eastside" on the back of his neck and " 'ES' and 'SJ' in large letters" on his right and left upper arms, for east side San Jose. In August 2013, James had a photograph of himself on his cell phone with several individuals including Nathan Cardenaz, who was holding a hat with the letter "M" on it, had a tattoo of "VMF" across the front of his neck, and was required to register as a gang member, and Jacob Valenzuela, who had four dots tattooed on his left arm. Officer Cuenca testified that he had seen photographs of Valenzuela "associating

15

with other VNG and VMF members and . . . displaying the M hand sign for [VMF]." The photograph on James's phone showed the group at Herridia's grave site wearing gang-related clothing. One individual in the photograph was making a hand sign of the letter "M," demonstrating allegiance to the VMF, and someone else had a red bandana draped around one of his shoulders. Another photograph showed a little kid in a baseball hat with the letter "M" on it. There was also a photo of James making a letter "M" hand sign.

In Officer Cuenca's opinion, James was a member of the Norteño criminal street gang on April 3, 2014, based on the circumstances of Mendoza's murder, the items at James's residence related to the Norteños and the VMF, his association with other VMF members, his gang clothing, the photos on his cell phone, his prior offenses, and his law enforcement contacts.

### d. *Gang evidence involving Richard*

Richard had a sustained juvenile adjudication for felony vehicle theft (Veh. Code, § 10851, subd. (a)) committed on February 2, 2008.

On September 27, 2009, Richard and another individual stole some beer from a 7-Eleven. Police located Richard in the parking lot of an apartment complex drinking and making noise with four to five other teenagers. The group was near two vehicles, both of which had been reported stolen. One girl was wearing a red t-shirt with a star and "Nor Cal" on it; another girl wore a red flannel shirt. All of the teens stated that they associated with Norteño members. Richard was on probation and had a warrant for his arrest for failing his electronic monitoring program. Richard stated that he lived with his grandmother and had dropped out of school. Richard said that he was a Northerner. Richard was arrested on the outstanding warrant and for possession of a stolen vehicle and violating a court order that he not associate with Norteños.

Richard had a sustained juvenile adjudication for felony vehicle theft (Veh. Code, § 10851, subd. (a)) and felony possession of a dirk or dagger concealed on the person

16

(§ 12020, subd. (a)(4)) on June 21, 2010. Former San Jose Police Officer Paul Soper testified that at approximately 11:40 p.m., he saw a vehicle speeding and driving erratically. The car had four occupants. As the officer tried to catch up to the vehicle, it sped off, made an erratic turn into a neighborhood, and crashed into a front yard. The occupants fled. Officer Soper apprehended Richard, who was a passenger in the car. Richard had a red bandana on him and a gravity knife in his pocket. The driver had a red bandana, a red belt, and a belt buckle with the number 14.

On March 19, 2012, Richard was a passenger in a car stopped for loud music and tinted windows. Richard had a knife in his sweatshirt pocket and was wearing baggy clothing, a red belt, and red shoes. Paul Lozano was the vehicle's driver. Lozano had "San Jo" tattooed on his right middle finger and "East Side" on his left middle finger. He also had "tattoos of the letter A in large format . . . in the middle of his throat surrounded by the double G, Gucci print." The "G" refers to "Grande" or the Varrio Norte Grande. Lozano's shoes had some red on them. According to Officer Cuenca, Lozano was a VNG member. Manuel Becerril was also in the car. Becerril had an "E," an "S," and the San Jose Sharks logo tattooed on his chest. Mark Guthrie was another passenger in the vehicle. Guthrie had four dots tattooed on his left hand, an "E" tattooed on his left calf, and an "S" tattooed on his right calf. Richard was arrested for possession of an illegal weapon.

On September 14, 2012, Richard was detained when officers responded to a call regarding a fight at a residence. The house was known as "a hazardous residence" because its residents were confrontational, aggressive, and assaultive toward the police. There had been multiple police calls there involving weapons and fights. The residence belonged to the Mendivil family. There was "spray paint graffiti of Varrio Norte Grande," "VNG" scratched into the walls, and Atlanta Braves clothing inside the residence. There were also stickers with "RIP Jimmy Copas" on them; Copas was a VNG member who had been killed. Matthew Mendivil was known to display VNG hand

17

signs and to associate with VNG members. He also had "McKee and White" tattooed across his abdomen and across both shins.

When the police arrived at the residence in September 2012, many people ran inside the residence but a few remained outside. Some of the men wore red clothing. Gary Mendivil swore at the officers and threw a drink at them. Earl Kleist also swore at the officers, disobeyed their command to stay seated, took a fighting stance, and resisted arrest. Kleist has "864" tattooed in "large numbers across his entire neck." Lozano was also present.

Richard had a felony conviction for vehicle theft (Veh. Code, § 10851, subd. (a)) committed on March 11, 2013. Santa Clara County District Attorney Investigator Gordy Bowen testified that on March 11, 2013, he ran a records check on the license plate of a van stopped at a traffic light and learned that the van had been reported stolen. Richard was driving the van and was wearing a black t-shirt and red shorts.

In Officer Cuenca's opinion, Richard was a Norteño criminal street gang member on April 3, 2014, based on the circumstances of Mendoza's murder, the wood plank found in Richard's backyard with the letters "VNG" on it, the red clothing Richard was wearing and his presence with other VNG members during the car stop on March 19, 2012, and the circumstances of Richard's other law enforcement contacts. Officer Cuenca's opinion was also based on Richard's admission to law enforcement on September 27, 2009, that he was a Northerner and that the admission was made while Richard was with five people, some of whom wore red clothing, who stated that they were associated with the Norteños.

**e.** *Gang evidence involving Nathan Cardenaz*

Nathan Cardenaz was convicted of illegally possessing a firearm (§ 12031, subd. (a)(1)) and two counts of threatening an officer (§ 69) on November 11, 2009. San Jose Police Officer Nick Byrd testified that on November 11, 2009, while on patrol with his partner, he activated his patrol car's emergency lights and siren to stop a vehicle. As

the officers approached, the vehicle slowed, but then pulled away, which it proceeded to do a couple of times. At some point, Cardenaz, a rear passenger, jumped out of the vehicle as it was traveling around 10 miles per hour. After Cardenaz rolled in the street, he got up and ran, armed with a handgun in his left hand. Cardenaz turned, faced the patrol car, and raised the firearm toward the officers from about five to 10 feet away. Officer Byrd accelerated and hit Cardenaz with the patrol car. Cardenaz slid across the hood with the gun in hand, landed on his feet, and ran into the yard of an apartment complex. The officers were able to apprehend Cardenaz after pursuing him in their patrol car and on foot. When the officers caught up with Cardenaz, he was no longer in possession of the gun and resisted arrest.

In Officer Cuenca's opinion, Cardenaz was a Norteño in the VMF subset. Cardenaz had "VMF" tattooed across his neck and was required to register as a gang member with law enforcement.

### f. *Hernandez's gang-related testimony and gang evidence involving Hernandez*

Hernandez testified that he started to associate with Norteños when he was about 11 years old and joined the NMD subset, or Norte's Most Deadly, when he was 15. Hernandez has a tattoo of "San Jo" on the left side of his neck to represent San Jose as a Northerner, "East Side" on both of his hands for East Side San Jose, which is also a gang reference, "NMD" across his chest, and four dots on his left elbow.

Hernandez stated that the NMD was "mainly" involved in drug sales, recruiting members, and "solv[ing] . . . problem[s] together." Although they "wouldn't go looking for it," they would "smash[] Sureños."

Hernandez stated that the NMD had to pay $200 in "taxes" to the Nuestra Familia, as did the other "neighborhood[s]." The taxes were collected "by the leader of [the] neighborhood" who paid them "[t]o a [NF] representative." If they did not pay their taxes, they "wouldn't be able to function as a Norteño neighborhood" and there would be

19

a "green light" on the neighborhood's members.

Hernandez testified that in the county jail, the subsets are "united"; they are "just . . . all Norteños." Norteños have a hierarchy in the county jail. Norteños do not allow "red on red" violence or "trip[ping] on a fellow Northerner." Subset members fall in line and do what the Norteño authority tells them to do. According to Hernandez, the "14 Bonds" are "a set of rules and regulations that Norteños in county jail and prison have to go by." Hernandez stated, "We have to abide those same rules outside of jail." If they violated the rules, there would be consequences, such as "hands-on discipline." Hernandez identified the gang rules found inside a safe along with Richard's credit card as the 14 Bonds.

In Officer Cuenca's opinion, Hernandez is a Northerner or a Norteño based on his "self-admission" and his associations.

### g. *David's gang-related testimony and gang evidence involving David*

David testified that he was a Northerner. David had been "jumped into" the NPS, or Northern Pride Soldiers, "hood" when he was 14. According to David, the difference between a Northerner and a Norteño is that a Northerner is someone who has not "earned the title 'Norteño.' "

David stated that Richard was a Northerner in the VNG "hood." James was a member of the VMF, which was a Northerner "hood."

In Officer Cuenca's opinion, David is a Northerner or a Norteño based on his associations as well as his "self-admission."

### h. *Officer Cuenca's opinion regarding the current offense*

Officer Cuenca opined that Mendoza's murder would assist, further, or promote the Norteño gang. The crime demonstrated that the Norteños were willing to go into rival territory and kill someone, which creates fear in the community and diminishes willingness to talk to law enforcement. The crime would also benefit Richard because it

20

would increase his status in the gang. According to Officer Cuenca, because two gang members committed the offense together, they could vouch for and trust each other and shared the same mindset.

In response to a hypothetical that tracked the facts of this case, Officer Cuenca opined that the murder would benefit the gang because it would send the message to the gang members in the area that a rival gang was willing to go into their stronghold to kill someone with a firearm and because it would lead community members to be less likely to cooperate with police and to testify, which would aid the gang's ability to continue their criminal activities. Officer Cuenca opined that the offense was committed in association with the gang because two people were responsible for the crime.

**B.** *Defense Case*

Deputy Probation Officer Justin Kulish testified on behalf of Richard. Kulish testified that he interviewed David on January 15, 2016, and wrote a report on him. Regarding the vehicle used in the murder, Kulish stated that David told him that when he cleaned the car, he was unaware that it had been used in a murder; David was informed of that a little bit later. Kulish testified that David said that Isaac told him that defendants had used the vehicle in a murder. David asked Kulish to recommend that the court sentence him to three and a half years.

Robert Aguero testified on behalf of Richard as an expert in cell phone analysis and cell phone data forensics. Aguero examined the call detail record and cell tower list for Richard's cell phone number between April 1 and April 7, 2014, and analyzed which cell towers were used during that period by the cell phone associated with that phone number. Aguero stated that he analyzed "the beginning towers only for all the calls that [he] mapped out." On April 3, 2014, there was "a gap in time" in the call detail records from 2:29 a.m. to 9:33 a.m. where the cell phone was "not hitting a cell tower." Aguero's

report analyzing and mapping the cell phone data was admitted into evidence.  The report did not include text messages.

The parties stipulated that the semiautomatic handgun located at the White Street address was inoperable.

Neither defendant testified.

### C.    *Charges, Verdicts, and Sentences*

Defendants were charged by indictment with murder (§ 187; count 1) and active participation in a criminal street gang (§ 186.22, subd. (a); count 2).  The indictment also alleged that defendants committed count 1 for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(5)) and that defendants were principals in the murder and a principal personally and intentionally discharged a firearm and proximately caused death (§ 12022.53, subds. (b)-(e).)

The jury found defendants guilty as charged.

The trial court sentenced each defendant to 25 years to life on count 1 plus 25 years to life for the firearm enhancement consecutive to a three-year term on count 2.

### III.    DISCUSSION

### A.    *Sufficient Evidence Supports the Gang Crime and Enhancement*

Relying on *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), defendants contend that there is insufficient evidence to sustain their convictions of active participation in a criminal street gang and the jury's findings that they committed the murder for the benefit of, at the direction of, or in association with a criminal street gang because "there was no substantial evidence that the predicate acts and current crime were attributable to and committed for the benefit of the Norteños . . . as opposed to the neighborhood gangs to which Richard and James were members."  (Capitalization and bold omitted.) Defendants argue that "the prosecution failed to establish an organizational relationship between [defendants' Norteño subsets] and the larger Norteño gang 'that would permit the inference that they constitute a single . . . organization.' "  The Attorney General

22

asserts that substantial evidence demonstrates an organizational and associational connection between defendants' subsets and the Norteños.

### 1. The STEP ACT and *Prunty*

The STEP Act provides a substantive gang offense for "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." (§ 186.22, subd. (a).) In addition, the Act provides a sentencing enhancement for individuals who commit felonies "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id.*, subd. (b)(1).)

A " 'criminal street gang' " is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) "A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' specified criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' " (*People v. Loeun* (1997) 17 Cal.4th 1, 4, quoting § 186.22, subd. (e).)

In *Prunty*, the California Supreme Court observed that the STEP Act requires the evidence to "show that it is the same 'group' that meets the definition of section 186.22(f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22(b)." (*Prunty*, supra, 62 Cal.4th at p. 72, fn. omitted.) "This 'sameness'

23

requirement means that the prosecution must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same." (*Id.* at p. 81.) For this reason, the court held that "when the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Id.* at pp. 67-68.) "The key is for the prosecution to present evidence supporting a fact finder's reasonable conclusion that multiple subsets are acting as a single 'organization, association, or group.' " (*Id.* at p. 80, quoting § 186.22, subd. (f).)

The defendant in *Prunty* was a Norteño member and a member of the Norteño subset the Detroit Boulevard. (*Prunty*, *supra*, 62 Cal.4th at p. 67.) The prosecution's theory was that the defendant committed an assault with the intent to benefit the Norteños, which had " 'a lot of subsets' " in the Sacramento area. (*Id.* at p. 69.) The prosecution presented evidence of two predicate offenses involving two other Norteño gang subsets, the Varrio Gardenland Norteños and the Del Paso Heights Norteños. (*Ibid.*) However, "the prosecution did not introduce specific evidence showing these subsets identified with a larger Norteño group" and did not show that those Norteño subsets "shared a connection with each other, or with any other Norteño-identified subset." (*Ibid.*) Thus, despite that the gang expert characterized the subsets as Norteño, because the prosecution "provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang," the prosecution failed to show that the evidence satisfying the elements of section 186.22 related to the same gang. (*Id.* at p. 82.)

The court remarked in *Prunty* that the requisite "connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of

24

the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together.  And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization."  (*Prunty*, *supra*, 62 Cal.4th at p. 71, fn. omitted.)  The prosecution could "introduce evidence of a relationship among [the] alleged subsets—a relationship that would permit the inference that they constitute a single . . . organization.  Or the prosecution could show some connection among the [particular] subsets and the [umbrella] gang the defendant intended to benefit."  (*Id.* at p. 81.)  Regardless of the prosecution's theory of proof, there must be evidence "demonstrating that th[e] subsets are somehow connected to each other or another larger group."  (*Id.* at p. 72.)  The STEP Act "envision[s] some measure of connection among members, such as unity of purpose, shared activities, or other manifestations of a common relationship."  (*Prunty*, *supra*, at p. 72.)

## 2.  Standard of Review

When determining a sufficiency of the evidence claim, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]' "  (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)  "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]"  (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)  The same standard applies to our review of evidence to support a gang allegation finding.  (*People v. Catlin* (2001) 26 Cal.4th 81, 139.)

### 3. Analysis

Here, the prosecution's theory of guilt was that defendants actively participated in the Norteños and committed the murder for the benefit of, at the direction of, or in association with the Norteños. Accordingly, the prosecution was required to prove that the Norteños are a criminal street gang within the meaning of the STEP Act. (§ 186.22, subds. (a), (b)(1), (f).) At issue here is the prosecution's proof that the Norteños "engaged in[] a pattern of criminal gang activity" (§ 186.22, subd. (f))—that is, that it was this "same group" that "committed the predicate offenses" (See *Prunty*, *supra*, 62 Cal.4th at p. 82).

The evidence showed that Richard and James identified as Norteños generally but that Richard claimed membership in the VNG subset while James claimed membership in the VMF subset. The prosecution presented evidence that both Richard and James committed several predicate offenses and that Nathan Cardenaz, a Norteño in the VMF subset, committed another predicate offense.

Because the prosecution's theory that the Norteños qualified as a criminal street gang rested on predicate offenses committed by members of two Norteño subsets, the prosecution had to "prove a connection between the gang and the subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 68.) In other words, "the evidence the prosecution introduce[d] to show an organizational or associational connection [had] to show that the 'criminal street gang' "—here, the Norteños—"include[d] those particular subsets." (*Id.* at p. 81.) We determine that the prosecution presented substantial evidence of a connection between the VNG and VMF subsets and of the subset members' shared identity with the Norteños, demonstrating the requisite organizational or associational connection between the groups.

The prosecution's gang expert, Officer Cuenca, testified that the Norteños are an umbrella organization with various "factions" that identify with a particular city or neighborhood. Officer Cuenca stated that the Norteño factions operate together, are

26

interconnected, and work together. "[T]hey are part of a much larger group than just . . . what is called a common criminal street gang." Officer Cuenca observed that in the county jail, the subsets unite under the larger Norteño group, explaining that he had seen kites, or inmate notes, with "names and rosters of particular Northern or Norteño groups and the subsets are written in those in [the] collective."

Officer Cuenca further testified that the VNG and VMF subsets were "very closely aligned." Officer Cuenca had seen instances where the subsets' members "fraternize[d]" with each other and he was aware that the subsets' members would sometimes wear clothing with the other subset's symbols on it. For example, a photograph admitted into evidence showed James, a VMF member, wearing an Oakland A's hat, which Officer Cuenca identified as a VNG symbol. James appeared in the photograph with Eric Zarate, who was displaying a VMF hand sign, and Angel Ledesma, who Officer Cuenca had seen "associating with members of VNG." Officer Cuenca's testimony was also buttressed by the prosecution's extensive evidence of predicate offenses and gang contacts.

In addition to Officer Cuenca's testimony, the prosecution presented evidence "showing collaboration among subset members, long-term relationships among members of different subsets, . . . [, and] behavior demonstrating a shared identity with one another or with a larger organization." (*Prunty*, *supra*, 62 Cal.4th at p. 73.)

The prosecution proved that Richard, a VNG member, and James, a VMF member, committed the charged murder together while out looking for Sureños, establishing that "members of [the] different subsets have 'work[ed] in concert to commit a crime,' " and demonstrating a collaborative connection between the two groups. (*Prunty*, *supra*, 62 Cal.4th at p. 78.) Moreover, defendants, who are brothers, lived in the same room on their grandmother's property. Found on the property was an ankle monitor with "VMF" and "Norte" etched onto it; a belt buckle inscribed with an "N"; and a plank that had "VNG" written on it. Also located on the property was a written "set of [Norteño] rules and regulations" identified as the "14 bonds." Hernandez, who began

associating with the Norteños when he was about 11 years old and joined the Norte's Most Deadly subset when he was 15, testified that a person would have a copy of the 14 bonds because Norteños have to follow the rules "or there will be consequences." Defendants' possession of these items at their home coupled with Hernandez's testimony on the 14 bonds "demonstrat[ed] a shared identity" between the VNG and VMF subsets and the Norteños. (*Id.* at p. 73.) Indeed, "proof that different Norteño subsets are governed by the same 'bylaws' . . . suggest[s] that they function—however informally—within a single hierarchical gang." (*Id.* at p. 77.)

Hernandez, age 26 at the time of his testimony, stated that he met Richard when he was around 17 years old. Although they were not really friends, they "would hang out every once in a while" when David, Hernandez's housemate and defendants' cousin, was also present. Hernandez met James a year or two after meeting Richard. Despite being in different Norteño subsets, Richard, James, and Hernandez would tell "a lot of war stories," some of which were gang-related. Hernandez had also seen Richard carrying a loaded handgun. Hernandez stated that he spoke to Richard after they had both been arrested in this case and that they discussed a text message that Richard had sent to Hernandez about cleaning the car used in the murder. Cell phone evidence corroborated Hernandez's testimony regarding the text message. This evidence demonstrates a relationship between, and "the sharing of material information among[,] the subsets of [the] larger [Norteño] group." (*Prunty*, *supra*, 62 Cal.4th at p. 71.)

Similarly, David, who self-identified as a Northerner[4] in the Northern Pride Soldiers subset, testified that he went to defendants' home "every day," had a strong friendship with Richard, and a good relationship with James. David admitted that he cleaned the car defendants used in the murder. David testified that James told him a day after the murder that he took off after Richard fired the gun because he got scared that

_____

[4] David testified that a Northerner is someone who had not "earned the title 'Norteño.'"

28

people would see. And David relayed the details Richard gave him about the shooting, including that Richard told him that he had dropped the gun off with "Shorty." David and Richard also communicated while in custody, with Richard telling David that Shorty was nervous and thought he was being watched. This evidence also demonstrates a relationship between, and "the sharing of material information among[,] the subsets of [the] larger [Norteño] group." (*Prunty*, *supra*, 62 Cal.4th at p. 71.)

Defendants rely on *People v. Nicholes* (2016) 246 Cal.App.4th 836 to support their insufficiency claim, but we find that case distinguishable. The prosecution's proof there consisted of a gang expert's general testimony about the Norteños, characterization of the relevant individuals as Norteños, and explanation that Norteños are associated with the Nuestra Famila. (*Id.* at pp. 846-848.) The expert's "general testimony [was] not linked to the particular subsets involved in th[e] case." (*Id.* at p. 848.) In ruling there was insufficient evidence to uphold the gang enhancements, the Court of Appeal observed that "[a]t a minimum, *Prunty* requires that the prosecution, in a case involving Norteños and testimony that Norteños operate through subsets, introduce evidence specific to the subsets at issue." (*Ibid.*) Here, in contrast, the gang expert's testimony included evidence on defendants' subsets and was augmented by evidence of collaboration among subset members and behavior demonstrating a shared identity as Norteños.

Thus, taken together and viewed in the light most favorable to the judgment, we conclude that the evidence demonstrates what was lacking in *Prunty*, namely, "an associational or organizational connection that unites members of a putative criminal street gang." (*Prunty*, *supra*, 62 Cal.4th at p. 67.) The evidence "show[ed] collaboration among subset members, long-term relationships among members of different subsets, [and] behavior demonstrating a shared identity with one another or with a larger organization," which demonstrated that "[the VMF and VNG] subsets are part of [the] larger [Norteño] group." (*Id.* at pp. 73-74.)

29

**B.**  *Admission of Predicate Acts and Gang Contacts Evidence*

Defendants contend that the trial court abused its discretion under Evidence Code section 352 (section 352) when it allowed the prosecution to present evidence of six predicate offenses and ten gang contacts to establish that the Norteños are a criminal street gang.[5]  Defendants argue that that the evidence was impermissibly cumulative and that the court failed to properly consider defendants' offer to stipulate that the Norteños are a criminal street gang.  Defendants also contend that the admission of the predicate acts and gang contacts evidence violated their due process right to a fair trial.  The Attorney General asserts that the trial court did not abuse its discretion under section 352 because the prosecution was not required to stipulate to the Norteños's gang status, the prosecution was required to prove defendants' guilt of the substantive gang offense and the truth of the gang enhancement, and the evidence was necessary under *Prunty* because defendants belonged to different Norteño subsets.

**1.  Trial Court Proceedings**

Defendants filed a motion in limine offering to stipulate that the Norteños constitute a criminal street gang under the STEP Act and arguing that if the prosecution refused to stipulate, the trial court should limit under section 352 evidence of the predicate crimes necessary to establish a pattern of criminal gang activity to proof of two predicate offenses.  Defendants observed that the STEP Act requires solely proof of two predicate offenses to establish a pattern of criminal gang activity and argued that proof of more than two predicates would be cumulative and more prejudicial than probative.[6]  The prosecution subsequently filed a motion to present evidence of six predicate offenses, consisting of certified conviction or juvenile adjudication records, and 17 gang contacts.

---

[5]  Defendants refer to 11 gang contacts, but mistakenly count Officer Soper's and Officer Rak's testimony about a June 2010 incident involving Richard as two separate gang contacts.

[6]  Defendants also claimed that the admission of more than two predicate offenses would violate Evidence Code section 1101, subdivision (a).

30

The prosecution asserted that the evidence was necessary "post-*Prunty*" because defendants were in different Norteño subsets.

At the in limine hearing, the trial court observed that the evidence had "some relevance" because the prosecution had to meet statutory and precedential requirements to prove the gang enhancements. The court asked the prosecution whether it would accept defendants' offer to stipulate that the Norteños are a criminal street gang, and the prosecution declined. Regarding why it should not be limited to evidence of two predicate offenses, the prosecution argued that there was no legal requirement that it "be hindered by presenting . . . the absolute legal minimum." The prosecution stated that because it was proceeding under a "Norteño umbrella theory" and the case involved several Norteño subsets, it had to show that the subsets were connected. Defendants acknowledged that it was "within the [prosecution's] right" to introduce evidence of the necessary predicates but argued that at some point the evidence would become cumulative and unduly prejudicial. The trial court ruled that the prosecution is "not limited to a stipulation" and is "not limited to predicate crimes."

The court revisited the issue later in the trial. Defendants argued that based on David's anticipated testimony that the subset members "congregate," "have barbecue[s]," and "tell war stories . . . as part of their Norteño communication," *Prunty*'s requirement that the subsets associate and commit crimes for the benefit of the Norteño umbrella gang would be met, rendering the evidence of gang contacts unnecessary and "excessive." The prosecution asserted that it should be allowed to introduce additional evidence of the subsets' association because defendants were going to challenge David's credibility and the evidence provided a "fuller picture of . . . association" than David was aware of. The prosecution added that because David was defendants' cousin, it wanted to prove "there are other connections," and that it did not think it would "take very long" or be "over the top." The court reaffirmed its earlier ruling permitting the evidence.

31

Defendants later renewed their section 352 objection to "allowing all of these [gang] contacts to come in," questioning the evidence's relevance. The court stated that it was aware that defendants were making a continuing objection and that it was "gauging it as to the evidence that is coming in." The court added, "The People are required to prove that there are gangs in Santa Clara County and that the [defendants] are associated with the members of gangs, and that this alleged crime was done for the benefit of a gang. So I don't know how else the jury can make that determination unless the jurors are told what the officers saw."

As detailed above, the prosecution ultimately presented evidence of six predicate offenses and 10 gang contacts. Two of the predicate offenses involved James: a juvenile adjudication for attempted burglary in 2008 and a juvenile adjudication for vehicle theft in 2010. Three of the predicate offenses involved Richard: a juvenile adjudication for vehicle theft in 2008; a juvenile adjudication for vehicle theft and possession of a dirk or dagger in 2010; and a conviction of vehicle theft in 2013. The remaining predicate offense involved VMF subset member Nathan Cardenaz: convictions of unlawful possession of a firearm and threatening an officer in 2009. Regarding the gang contacts, four involved James. One of the four consisted of the factual basis for James's 2010 adjudication of vehicle theft. The others involved James kicking someone who had Sureño writings in his backpack in high school in 2008; cutting off his ankle bracelet in 2009; and being a passenger in a car with other Norteño subset members in 2014. There were five police contacts pertaining to Richard: Richard stealing beer with individuals who identified themselves as Northerners in 2009; the factual basis for Richard's vehicle theft and weapon possession in 2010; being a passenger in a car with Norteño subset members and possessing a knife in 2012; Richard's detention after a disturbance call at a house with Norteño subset members in 2012; and the factual basis for Richard's 2013 vehicle theft conviction. Finally, the prosecution presented evidence of the factual basis

32

for Cardenaz's 2009 convictions, where Cardenaz ran from officers while armed with a gun, at one point raising the firearm toward the officers' patrol car.

## 2. Legal Principles

Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." For section 352 purposes, " 'prejudicial' is not synonymous with 'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues. [Citations.]" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) "Although no bright-line rules exist for determining when evidence is cumulative, we emphasize that the term 'cumulative' indeed has a substantive meaning, and the application of the term must be reasonable and practical." (*People v. Williams* (2009) 170 Cal.App.4th 587, 611 (*Williams*).)

A trial court's ruling on the admission of gang evidence is reviewed for abuse of discretion. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194 (*Carter*).) "The trial court has great discretion in determining the admissibility of evidence, and on appeal, we find reversible error if the trial court's exercise of its discretion was arbitrary, capricious, or patently absurd resulting in a manifest miscarriage of justice. [Citations.]" (*Williams*, *supra*, 170 Cal.App.4th at p. 606.)

## 3. Analysis

Here, the prosecution alleged that defendants murdered Mendoza for the benefit of, at the direction of, or in association with a criminal street gang *and* charged defendants with actively participating in a criminal street gang. As stated above, the prosecution's theory of guilt was that the criminal street gang at issue was the Norteños. Thus, the prosecution had to prove that the Norteños qualified as a criminal street gang under the STEP Act. (§ 186.22, subds. (a), (b)(1), (f).) And, because defendants were

members of different Norteño subsets, the prosecution had to establish a connection between each of defendants' subsets and the Norteños. (See *Prunty*, *supra*, 62 Cal.4th at pp. 67-68.) Moreover, to prove the substantive gang offense, the prosecution had to establish that defendants knew that the Norteños engage in a pattern of criminal gang activity. (§ 186.22, subd. (a).; see *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 [describing the second element of the offense as "knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity"].)

Defendants claim that the probative value of the predicate offenses and gang contacts evidence "was greatly diminished" by their offer to stipulate "to the ultimate fact of the Norteños' status as a criminal street gang," and assert that the evidence "was relevant only to the status of the Norteños as a criminal street gang." However, defendants overlook the evidence's relevance to the substantive gang offense, which required the prosecution to prove that defendants knew that the Norteños engage in a pattern of criminal gang activity. The proposed stipulation did not include such proof.

The evidence concerning the gang contacts, four of which involved James and five that involved Richard, included evidence of defendants' acts and associations, which was highly probative of defendants' awareness that the Norteños engage in a pattern of criminal gang activity. The evidence was also probative of Officer Cuenca's credibility and the weight to be given his opinion that defendants were active Norteño members, especially given that defendants were members of different Norteño subsets. In addition, because several of the gang contacts provided the factual bases for some of the predicate offenses, the likelihood that the jury would convict defendants of the charged offenses because defendants had gone unpunished in the past was diminished. And the evidence of the predicate offenses and the gang contacts, which largely involved thefts and weapon possession, was not more inflammatory than the evidence of Mendoza's murder. Finally, much of the evidence bore on the VNG and the VMF subset members' association with

34

one another and their identification with the umbrella Norteño gang, as required under *Prunty*.

Defendants cite the generally prejudicial nature of gang affiliation evidence to argue that the predicate offenses and gang contacts evidence admitted here was more prejudicial than probative, and we acknowledge that evidence of gang affiliation may be inflammatory. (See *Carter*, *supra*, 30 Cal.4th p. 1194 ["evidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged—and thus should be carefully scrutinized by trial courts"].) However, "nothing bars evidence of gang affiliation that is directly relevant to a material issue" (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 588), unless its probative value is substantially outweighed by its prejudicial effect (§ 352; *People v. Williams* (1997) 16 Cal.4th 153, 193). For the reasons stated above, the gang evidence here was directly relevant to the gang enhancement and the substantive gang offense and was not so inflammatory that its probative value was substantially outweighed by its prejudicial effect. Thus, in view of the record, we conclude that the trial court was acting within its broad discretion when it admitted the evidence of six predicate offenses and ten gang contacts, as the evidence was highly probative, not "merely cumulative," and its probative value was not substantially outweighed by its prejudicial effect. (*Williams*, *supra*, 170 Cal.App.4th at p. 611; see *People v. Hill* (2011) 191 Cal.App.4th 1104, 1137-1139 [finding no abuse of discretion in the admission of eight predicate offenses to prove gang enhancement alleged against lone defendant]; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1519 [upholding admission of nine gang incidents to prove motive and intent as noncumulative and within the trial court's section 352 discretion].)

### 4. The Gang Evidence Did Not Violate Defendants' Due Process Rights to a Fair Trial or Prejudice Defendants

Defendants argue that certain gang contacts should have been excluded because they "lack[ed] any pertinent evidence of the interaction between gang members from different Norteño subsets." However, even if we were to find that some of the gang evidence should have been excluded under section 352, we would conclude that the error was harmless and did not result in a fundamentally unfair trial.

Relying in part on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), defendants argue that the gang evidence violated their federal due process rights to a fair trial. In *Albarran*, the court determined that the gang evidence was highly prejudicial and only marginally relevant, and held that its admission violated the defendant's right to due process. (*Albarran*, *supra*, at pp. 230-232.) The court stated that the case before it "present[ed] one of those rare and unusual occasions" where the error was of federal constitutional dimension. (*Id.* at p. 232.) The court explained, " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]" (*Id.* at p. 229.)

Here, although some of the gang evidence did not involve interactions between members of the VNG and the VMF subsets, there were still permissible inferences the jury could draw from the evidence, namely, that VNG and VMF members, and by extension the Norteños, engage in a pattern of criminal gang activity and that defendants were aware of it and participated in it. And, as stated above, the evidence was relevant to Officer Cuenca's credibility and opinion testimony. In addition, the evidence was not "extremely inflammatory." (*Albarran*, *supra*, 149 Cal.App.4th at p. 227.) While two of the incidents included some threatening conduct toward the police, the remainder of the evidence pertained to thefts, weapon possession, a broken ankle bracelet, and a high

36

school fight.  None of the evidence was " ' "of such quality as *necessarily* prevents a fair trial." ' "  (*Id.* at p. 229, italics added.)

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson*[7] test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error.  [Citations.]"  (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).)  Here, even if some of the gang evidence had been excluded under section 352, it is not reasonably probable that the verdicts would have been more favorable to defendants based on the strength of the evidence against them and the trial court's limiting instructions.

The evidence established that on April 4, the day after Mendoza's murder, Hernandez saw David clean a Jeep belonging to Isaac and James.  David told Hernandez that defendants had "murked," or murdered, "somebody in that car" and that he was cleaning it because defendants told him to.  Hernandez and David lived together and were good friends.  Hernandez had seen Richard carry a gun a few times.

David testified that about a day after the murder, James told David that he "took off" after Richard fired the gun because he got scared that people would see.  Richard told David that he and James had gone looking for Sureños and that he shot the driver of a vehicle that pulled up next to them after the driver reached for something and gave Richard dirty looks.  Richard said that James was driving.  David admitted telling Hernandez "what [he] knew" because he thought he could trust him.  David also admitted that he cleaned the Jeep, which was parked down the street from David's and Hernandez's residence.  Similar to Hernandez, David had seen Richard with a gun before the murder.

Video surveillance footage showed a Jeep repeatedly driving up and down the streets of a Sureño neighborhood on the date of the murder.  After almost a half hour, the

---

[7] *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

Jeep's lights turned off. Minutes later, the footage showed the Jeep approach Mendoza's vehicle from behind with its lights off. The footage then showed what appeared to be two shots fired from the Jeep toward Mendoza's vehicle. At least one of the shots was fired from the Jeep as it drove in Mendoza's blind spot. Mendoza was shot in the left upper back and left upper arm.

The Jeep in the surveillance footage had something metallic covering its sunroof area. Based on the information Hernandez provided to the police, the police located a Jeep Cherokee parked close to Hernandez's and David's residence that matched the Jeep in the surveillance footage.

Three days after the murder, Richard sent a text message to Hernandez's phone asking to talk to David. Minutes later, Richard sent a second message to Hernandez's phone asking, "Didu whip it down HELLA good?" The police interpreted "whip" as "wipe." Cell phone records corroborated Hernandez's and David's testimony regarding the calls that Isaac and Richard made to Hernandez's phone after the murder to reach David. David did not have his own cell phone.

In addition to this strong evidence of defendants' guilt, the trial court gave the jury limiting instructions on the "gang activity" evidence. The court instructed that the evidence could be considered "only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and further allegations charged and/or [whether] a defendant had a motive to commit the crimes. . . ." The court also told the jury that it could consider the gang activity evidence to evaluate a witness' credibility and when it considered the facts and information relied on by an expert. The court instructed that the jury could not consider the evidence for any other purpose and could "not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." We presume that jurors follow the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.)

Thus, given the strength of the evidence of defendants' guilt and the trial court's limiting instructions on the "gang activity" evidence, we determine that a more favorable trial outcome for defendants is not "reasonably probable" had some of the predicate offenses and gang contacts evidence been excluded. (*Partida*, *supra*, 37 Cal.4th at p. 439.)

## C. *Declaration Against Penal Interest*

James contends that the trial court erred when it allowed David to testify that Richard told him that James was driving the Jeep during the murder. James acknowledges that Richard's statement exposed Richard to conspiracy liability, but argues that Richard's identification of James did not qualify as a declaration against penal interest because it "did not create, increase or expand upon that culpability." James also asserts that the statement should have been excluded as unreliable. The Attorney General counters that the court's decision to admit the entirety of Richard's statement to David was not an abuse of discretion.

### 1. Trial Court Proceedings

David testified at trial regarding what Richard told him "had happened in that Jeep." David stated that Richard said that he and James had been drinking with a friend. After they dropped the friend off, they went to a liquor store. James was driving. The store was closed, and they went "in the back streets to see if they can find anyone, anyone being Sureños. They don't find anyone, and as they were coming out, . . . they see a car, and it's at the stop sign, far away. And he's coming up, and he stops right there, and Richard said he sees him reach down, and so he started shooting at him because he thought he was reaching for a gun." Then "[t]hey took off." When asked if Richard was bragging, David testified that Richard "was more just . . . informing [him] of what happened."

The prosecution moved in limine to introduce Richard's statement to David as a declaration against penal interest under Evidence Code section 1230. James moved in

39

limine to exclude the statement. At the in limine hearing, James argued that the portion of Richard's statement identifying James as the driver was not disserving to Richard and thus did not qualify as a declaration against interest, and that the evidence of a conspiracy was too weak to establish the admissibility of the statement. The prosecution argued that when Richard made the statement, he was "fully aware of the . . . hotness of the Jeep" and that "[his] association to that Jeep could be a huge problem legally for him"; "the link of Richard . . . to James . . . in the Jeep is how Richard . . . is going to get caught." The prosecution also argued that Richard's statement exposed him to liability for active participation in a criminal street gang because that offense typically "requires a second person."

The trial court ruled that the statement was admissible "even if not independently inculpatory of the declarant" as it was "against the declarant's interest such that a reasonable man in the declarant's position would not have made the statement[] unless he believed [it] to be true." The court observed that under the "contextual approach," the law allows admission of portions of a statement that, "although not disserving of the defendant's penal interests also are not merely . . . self-serving, . . . but, . . . inextricably tied to a part of a specific statement against penal interest." (Internal quotation marks omitted.) The court found that the facts of the offense amounted to "a conspiracy situation," "a co-participant situation," and "an accessory during and after the fact situation," along with "the gang activity in the context of this alleged crime," as Richard and James were "engaged in a joint planned drive-by shooting" with surveillance footage showing "James's car . . . driving around in circles looking for someone." The court further found that Richard "never shifted blame as to who was the shooter to James" and that Richard was aware when he made the statements to David that the Jeep was " 'hot' . . . with the police." "Richard knew at the time he made the statements to David

40

that the facts that tethered Richard to the murder is his relationship to the non-declarant James and the non-declarant James's vehicle."[8]

The court determined that Richard's statement was "more reliable than not because [it was] allegedly spoken just after the murder and while the [Jeep] was in the process of being cleaned"; "[b]ecause he is commenting on his brother"; because the statements were consistent with the circumstances of the offense, which were partially captured by the video surveillance; and because Richard was speaking to David, who was his cousin, confidant, and fellow Norteño gang member whom he trusted to clean the Jeep.

### 2. Legal Principles

"Unless it falls within an exception to the general rule, hearsay is not admissible. ([Evid. Code, § 1200,] subd. (b).) 'The chief reasons for this general rule of inadmissibility are that the statements are not made under oath, the adverse party has no opportunity to cross-examine the declarant, and the jury cannot observe the declarant's demeanor while making the statements.' [Citations.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610 (*Duarte*).)

"In California, '[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him [or her] to the risk of . . . criminal liability . . . that a reasonable man [or woman] in his [or her] position would not have made the statement unless he [or she] believed it to be true.' ([Evid.Code,] § 1230.)" (*Duarte*, *supra*, 24 Cal.4th at p. 610.) "[T]he rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his [or her] statement made against that

---

[8] The court also determined that "[i]t is arguable that these are also spontaneous statements."

41

interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements. [Citation.]"  (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)

"To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.'  [Citation.]  'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'  [Citation.]"  (*Grimes*, *supra*, 1 Cal.5th at p. 711.)  In addition, the court considers the statement "in context."  (*Id.* at p. 716.)

We review a trial court's decision to admit a hearsay statement as a declaration against interest under Evidence Code section 1230 for abuse of discretion.  (*Grimes*, *supra*, 1 Cal.5th at p. 711.)  Under that standard, a trial court's evidentiary ruling " 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Brown* (2003) 31 Cal.4th 518, 534.)  "Whether a trial court has correctly construed Evidence Code section 1230 is, however, a question of law that we review de novo."  (*Grimes*, *supra*, at p. 712.)

### 3. Analysis

We conclude that the trial court did not abuse its discretion when it admitted the entirety of Richard's statement to David as a declaration against penal interest.  We find two cases, *People v. Samuels* (2005) 36 Cal.4th 96 (*Samuels*) and *People v. Greenberger* (1997) 58 Cal.App.4th 298 (*Greenberger*), instructive.

In *Samuels*, the defendant solicited the declarant to murder her ex-husband.  (*Samuels*, *supra*, 36 Cal.4th at p. 102.)  A witness testified that the declarant told him that

" '[h]e had done it and Mike [Silva] had helped him. And that [defendant] had paid him.' " (*Id.* at p. 120.) The witness "further testified that [the declarant] said defendant had paid him, that [the declarant] had skimmed money off the top for himself, and then paid the balance to Mike Silva. [The declarant] also told [the witness] that he paid Silva in cocaine 'in lieu of the money.' " (*Ibid.*)

The California Supreme Court upheld the admission of the statement as a declaration against penal interest, finding it was "in no way exculpatory, self-serving, or collateral." (*Samuels*, *supra*, 36 Cal.4th at p. 120.) In doing so, it rejected the defendant's claim that the declarant's comment " 'that [defendant] had paid him' for the killing was either collateral to his statement against penal interest, or an attempt to shift blame." (*Ibid.*) Rather, the court determined that the declarant's "reference [to the defendant] was inextricably tied to and part of a specific statement against penal interest." (*Id.* at p. 121.) "This admission, volunteered to an acquaintance, was specifically disserving to [the declarant's] interests in that it intimated he had participated in a contract killing—a particularly heinous type of murder—and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the witness's] recollection of [the declarant's] precise comments to him." (*Ibid.*)

In *Greenberger*, the defendant argued that the codefendant declarant's statements that implicated the defendant "were collateral to anything incriminating of [the codefendant declarant] and should have been excluded by the trial court." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 337.) The Court of Appeal disagreed. (*Ibid.*) The court observed that "a statement's content is most reliable in that portion which inculpates the declarant" and "is least reliable in that portion which shifts responsibility," but that "[c]ontroversy necessarily arises when the declarant makes statements which are self-inculpatory as well as inculpatory of another." (*Id.* at p. 335.) The court found that "at

43

the time [the codefendant declarant] made the statements about having 'been with [the defendant] on a homicide' and 'they shot him 13 times' and describing how he had been paid for driving the car, the statements were specifically disserving of [the codefendant declarant's] penal interest because they subjected [the codefendant declarant] to the risk of criminal liability to such an extent that a reasonable person in his position would not have made them unless he believed them to be true." (*Id.* at p. 337.)

Here, as in *Greenberger*, the declarant was James's codefendant, Richard. As in both *Samuels* and *Greenberger*, the statement did not shift the blame or minimize Richard's involvement; it was self-inculpatory and inculpatory of James. Richard's comment that James was the driver was "an integral part of the statement in which he implicated himself in planning and participating" in Mendoza's murder (*Greenberger*, *supra*, 58 Cal.App.4th at p. 340), and "was inextricably tied to and part of a specific statement against penal interest" (*Samuels*, *supra*, 36 Cal.4th at p. 121). And by admitting that he committed the murder specifically with James, a fellow Norteño, Richard exposed himself to further criminal liability for active participation in a criminal street gang. The statement " 'so far subjected [Richard] to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.' " (*Duarte*, *supra*, 24 Cal.4th at p. 610.)

In addition, the circumstances demonstrated the statement's reliability. The statement was "volunteered to an acquaintance" (*Samuels*, *supra*, 36 Cal.4th at p. 121), Richard's friend, fellow gang member, and cousin David. It was therefore made in "the most reliable circumstance[,] . . . one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures," rather than the "the least reliable circumstance[,] . . . one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335.) Moreover, in inculpating James, Richard was inculpating his brother and fellow Norteño member. Richard and James's

44

familial and gang relationship increased the statement's trustworthiness because it is unlikely Richard would have inculpated his own brother and gang cohort unless the statement were true.

James argues that Richard's statement was not reliable because *David* had a motive to lie to protect his brother, Isaac, who co-owned the Jeep with James. However, David's alleged motive bears on his credibility as a witness, not on the reliability of Richard's statement to him. As the Attorney General points out, " '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

For these reasons, under the totality of the circumstances, we determine that the trial court did not abuse its discretion when it admitted Richard's statement to David in full as a declaration against penal interest because "the reference to [James] incorporated within this admission" was not "a collateral assertion." (*Samuels*, *supra*, 36 Cal.4th at p. 121.)

### 4. Violation of James's Constitutional Rights to Due Process and a Jury Trial

James contends that the admission of Richard's statement identifying him as the driver violated his right to due process and to a jury trial because he was unable to cross-examine Richard, who exercised his right to remain silent.[9] We have determined, however, that the statement was properly admitted as an integral part of Richard's declaration against penal interest. Thus, there was "necessarily no constitutional violation." (*Samuels*, *supra*, 36 Cal.4th at pp. 119, 123 [rejecting the defendant's claims

---

[9] James acknowledges that his trial counsel did not seek exclusion of Richard's statement under the Sixth Amendment's confrontation clause because the statement was not testimonial. James does not raise a Sixth Amendment confrontation clause claim here as he "agrees there was no violation."

that the admission of the decedent's statements under the state of mind hearsay exception violated her Sixth, Eighth, and Fourteenth Amendment rights].)

### D. *Coconspirator Statement*

James contends that the trial court improperly admitted as a coconspirator statement David's testimony that Isaac told him that Richard directed Isaac to ask David to clean the Jeep. James asserts that the court erred because there was insufficient evidence that James was part of a conspiracy to obstruct justice. The Attorney General argues that the trial court did not abuse its discretion in admitting the statement because the evidence demonstrated that Isaac conspired with Richard and it was not improper to admit the statement at James's joint trial with Richard as the court instructed the jury that the evidence against Richard and James had to be considered separately. The Attorney General also contends that the statement was properly admitted by the court as a spontaneous statement.

### 1. Trial Court Proceedings

During redirect, the prosecution asked David if "[w]hen Isaac . . . told [him] to clean the car, [Isaac] t[old] [him] specific directives from Richard . . . on why." David responded affirmatively, stating that Isaac "told me if [*sic*] Richard asked him, if I could clean the car for him." James objected, asserting the testimony did not qualify as a coconspirator statement.

Outside the jury's presence, the prosecutor argued that the statement qualified as a coconspirator statement because Richard, James, Isaac, and David were engaged in a conspiracy to obstruct justice by cleaning or destroying the Jeep. The prosecution asserted that James's involvement in the conspiracy would be demonstrated by evidence that James instructed Isaac to tell David to burn the car on Mount Hamilton. The prosecution claimed that Richard's statement to Isaac was admissible both as a party admission and as a coconspirator statement and that Isaac's statement to David qualified as a coconspirator statement. The prosecution argued that David's testimony was also

46

admissible under Evidence Code section 356, which allows a party to inquire into "the whole" of a declaration or conversation that has partially been admitted into evidence, because defendants cross-examined David about portions of Isaac's statement and there was "a misimpression in front of the jury that Isaac, on his own, directed David to clean the car." James argued that the evidence did not establish that he agreed to participate in the conspiracy and that his directive to burn the car was not part of the same conversation where David learned from Isaac that Richard had directed Isaac to ask David to clean the car.

The trial court held an Evidence Code section 402 hearing to determine when James's statement about burning the car occurred. David testified at the hearing that when Isaac dropped off the Jeep with him on the day of the murder, Isaac told him that Richard directed Isaac to ask David to clean the car. David stated that during the same conversation, Isaac said that James wanted to burn the car on Mount Hamilton.

The trial court ruled that David could testify that Isaac told him that Richard directed Isaac to ask David to clean the car because the statement qualified as a coconspirator statement under Evidence Code section 1223 and as spontaneous statement under Evidence Code section 1240.[10] The trial court also allowed the prosecution to ask David about James's statement to Isaac, regarding burning the Jeep, that Isaac relayed to David.

David testified in front of the jury that Isaac told him that Richard asked Isaac to ask David to clean the car. When the prosecution inquired whether "there was an intention to burn the Jeep on Mount Hamilton," David stated that he only remembered

---

[10] The trial court also ruled that the statement was admissible under the hearsay exceptions found in Evidence Code sections 1220, 1221, 1238, and 1241, as well as under Evidence Code section 356 because it was "important that the full statement come in." Because neither party addresses the trial court's admission of the statement on those grounds and we determine that the statement's admission was harmless, we do not examine the validity of the trial court's additional bases for admission.

"fragments" of the conversation, which was "between . . . Isaac and Richard," and that he could not remember "who said what." David testified that the day after he cleaned the Jeep, Richard confirmed that David had cleaned it and asked David for details of what he had cleaned.

### 2. Legal Principles

Evidence Code section 1223 authorizes the admission of a coconspirator's hearsay statement if: "(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [and] [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy."

Thus, "evidence of a hearsay 'statement' of a coconspirator is inadmissible against the defendant absent ' "independent evidence to establish prima facie the existence of . . . [a] conspiracy." ' [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 482.) " 'Once independent proof of a conspiracy has been shown, three preliminary facts must be established: "(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy." ' " (*In re Hardy* (2007) 41 Cal.4th 977, 996 (*Hardy*).) "[W]hether statements made are in furtherance of a conspiracy depends on an analysis of the totality of the facts and circumstances in the case." (*People v. Hardy* (1992) 2 Cal.4th 86, 146.)

Evidence Code section 1240 authorizes the admission of a spontaneous statement "if the statement: (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

" ' "To render [a statement] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to

48

produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." [Citations.]' [Citation.]" (*People v. Thomas* (2011) 51 Cal.4th 449, 495 (*Thomas*).)

We apply the abuse of discretion standard in reviewing a trial court's decision to admit or exclude hearsay evidence, including the court's determination of whether a hearsay exception's foundational requirements have been met. (*People v. Martinez* (2000) 22 Cal.4th 106, 120.)

A trial court's state law error in admitting hearsay evidence is reviewed for prejudice under *Watson*, *supra*, 46 Cal.2d 818. (*Duarte*, *supra*, 24 Cal.4th at p. 619.) We assess whether it is "reasonably probable that a result more favorable to defendant would have been reached" absent the evidence's admission. (*Watson*, *supra*, at p. 837.)

### 3. Any Error Was Harmless

Here, it appears that the foundational requirements of the coconspirator statement and spontaneous statement hearsay exceptions were not satisfied.

Regarding the admission of David's testimony as evidence of a coconspirator statement, the evidence did not show that *James* participated in the conspiracy to obstruct justice by destroying evidence. David testified that Isaac told him that *Richard* asked Isaac to ask David to clean the car. When asked whether "there was [also] an intention to burn the Jeep on Mount Hamilton," David stated that he only remembered "fragments" of the conversation, which was "between . . . Isaac and *Richard*," and that he could not remember "who said what." David further testified that the day after he cleaned the Jeep, *Richard* confirmed with David that David had cleaned it. Thus, evidence that James

49

" ' "was participating or would later participate in the conspiracy" ' " to obstruct justice was lacking.[11] (*Hardy*, *supra*, 41 Cal.4th at p. 996.)

Nor does it appear that the foundational requirements of the spontaneous statement hearsay exception were established. As stated, to qualify as a spontaneous statement, the statement must have been made " ' "before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance." ' " (*Thomas*, *supra*, 51 Cal.4th at p. 495.) Given that when Richard made the statement to Isaac, Richard had been able to gather his " ' "reflective powers" ' " enough to realize that the Jeep should be cleaned, it seems that there was " ' "time to contrive and misrepresent." ' " (*Ibid.*) While the Attorney General argues that *Isaac's* statement was admissible as a spontaneous statement, he overlooks that there were two levels of hearsay in David's testimony admitted against James— Isaac's statement to David and Richard's statement to Isaac—each requiring a hearsay exception.[12]

But even if the court erred when it admitted David's testimony that Isaac told him that Richard directed Isaac to ask David to clean the Jeep, we conclude that the admission of the evidence against James was harmless under *Watson*.

The complained of testimony—that Isaac told David that Richard directed Isaac to ask David to clean the Jeep—was circumstantial evidence of Richard's guilt in the murder, not James's, because it demonstrated that Richard wanted the Jeep cleaned. And

---

[11] The Attorney General does not assert that James's claim has been forfeited based on his failure to object to David's testimony in front of the jury, which was different from David's testimony at the Evidence Code section 402 hearing. Thus, we do not address whether this claim has been properly preserved.

[12] Nor was Richard's statement to Isaac admissible against James as a party admission. (See Evid. Code, § 1220 [providing that "[e]vidence of a statement is not made inadmissible by the hearsay rule when offered *against the declarant* in an action to which he is a party in either his individual or representative capacity" (italics added)].)

50

the evidence was buttressed by David's testimony that Richard later spoke to David directly to confirm that the Jeep had been cleaned and to get details on the cleaning.

To the extent that the testimony circumstantially inculpated James because James owned the Jeep, it equally inculpated Isaac, who co-owned the Jeep with James. The evidence thus supported James's defense at trial that the prosecution had not proved that James, rather than Isaac, drove the Jeep during the murder. James specifically raised Isaac's ownership of the Jeep during closing argument as well as the fact that it was Isaac who asked David to clean the Jeep, albeit under Richard's direction, and it was Isaac who was driving the Jeep hours after the murder.

For these reasons, we determine there is no reasonable probability of a more favorable trial outcome for James had David's testimony that Isaac told him that Richard directed Isaac to ask David to clean the Jeep been excluded. (See *Watson*, *supra*, 46 Cal.2d at p. 837.)

### E. *Failure to Give Clarifying Instruction on Gang Enhancement*

Defendants contend that the trial court erred when it instructed the jury on the gang enhancement because the court failed to define the phrase " 'in association with any criminal street gang.' " Defendants argue that the court had a sua sponte duty to clarify the phrase because under *Albillar*, *supra*, 51 Cal.4th at pages 60-62, it is "a legal term with a specific definition." The Attorney General counters that the claim has been forfeited and that *Albillar* did not assign a technical or legal meaning to the term.

#### 1. Trial Court Proceedings

Apparently using CALCRIM No. 1401,[13] the trial court instructed the jury on the gang enhancement as follows: "If you find the defendant guilty of the crime charged in

---

[13] The written copy of the jury instructions are not part of the record on appeal. According to Richard, the written instructions could not be located by the superior court or obtained from counsel below. The trial court's instruction on the gang enhancement is materially indistinguishable from CALCRIM No. 1401.

Count 1, murder, you must then decide whether the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang.  [¶]  To prove the[] allegation, the People must prove:  [¶]  1, The defendant committed [Count 1] at the benefit, at the direction of, and in association with a criminal street gang; and,  [¶]  2, The defendant intended to aid, further or promote criminal conduct by gang members."  The court informed the jury that "a criminal street gang" was defined in the instruction for count 2 and that the People had to prove the allegation beyond a reasonable doubt.

## 2.  Legal Principles

"In a criminal case, a trial court has a duty to instruct the jury on ' " ' "the general principles of law relevant to the issues raised by the evidence." ' " '  [Citation.]  The 'general principles of law governing the case' are those principles connected with the evidence and which are necessary for the jury's understanding of the case.  [Citations.]  As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is [the] 'defendant's obligation to request any clarifying or amplifying instruction.'  [Citation.]"  (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*).)

" '[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification.  If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' "  (*Estrada*, *supra*, 11 Cal.4th at p. 574.)

While "[a] court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language, . . . it does have a duty to define terms that have a technical meaning peculiar to the law."  (*People v. Bland* (2002) 28 Cal.4th 313, 334 (*Bland*).)  " '[T]erms are held to require clarification by the trial court

when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance.' " (*Ibid.*)

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law." (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

### 3. Analysis

Defendants claim that "[u]nder the holding of the California Supreme Court in . . . *Albillar* . . . 'in association with a criminal street gang' is a legal term with a specific definition that needed to be provided to the jury." Citing both the majority opinion and Justice Werdegar's concurring and dissenting opinion, defendants assert that *Albillar* "provided a definition for that statutory phrase" that "requires a showing that the defendant 'relied on . . . common gang membership and the apparatus of the gang in committing' the charged crimes."

We read *Albillar* differently. The issue in *Albillar* was not whether the trial court committed instructional error by failing to define "in association with a criminal street gang," but whether there was sufficient evidence to uphold the jury's true finding on the gang enhancement. (*Albillar*, *supra*, 51 Cal.4th at p. 59.) In determining there was sufficient evidence in the record for the jury to conclude that the defendants committed the crimes "in association with the gang," the court stated that "[t]he record supported a finding that defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses." (*Id.* at p. 60.) After summarizing the evidence in support of the finding, the court concluded, "We therefore find substantial evidence that defendants came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang." (*Id.* at p. 62.)

Justice Werdegar disagreed with the majority's determination that there was sufficient evidence to support the jury's finding on the enhancement. (*Albillar*, *supra*, 51 Cal.4th at p. 68, conc. & dis. opn. of Werdegar, J.) In doing so, Justice Werdegar commented that the majority's "definition" of " 'in association with' " focused on "gang

53

members as *associating with one another*, rather than as associating *with the gang*," which she believed "threaten[ed] to render a portion of section 186.22, subdivision (b) redundant." (*Id.* at p. 73.) Justice Werdegar also referred to Merriam-Webster's Eleventh Collegiate Dictionary's definition of the term " 'associate,' as '. . . 1: to come or be together as partners, friends, or companions  2: to combine or join with other parts.' " (*Id.* at p. 70, fn. 2.)

Neither the majority opinion nor Justice Werdegar's concurring and dissenting opinion assigned to the phrase, "in association with [a] criminal street gang" (186.22, subd. (b)), a "technical meaning peculiar to the law" (*Bland*, *supra*, 28 Cal.4th at p. 334). Moreover, the majority did not hold that the STEP Act requires the prosecution to establish in every instance that "[the] defendants relied on their common gang membership and the apparatus of the gang" in order to prove that the offense was committed "in association with a criminal street gang." (*Albillar*, *supra*, 51 Cal.4th at p. 60.) Rather, the majority determined that, there, the evidence of the defendants' reliance on their common membership and the gang apparatus was sufficient to prove that "defendants came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang." (*Id.* at p. 62.) We find the majority's conclusion that "[the] defendants came together *as gang members*" (*ibid.*) particularly pertinent here because it tracks the dictionary definition of the term "associate" that Justice Werdegar noted in her opinion—" 'to come or be together as partners, friends, or companions' " (*id.* at p. 70, fn. 2, conc. & dis. opn. of Werdegar, J.).

For these reasons, we conclude that defendants have not established that the phrase, "in association with [a] criminal street gang" (186.22, subd. (b)), has "a technical meaning peculiar to the law" that " 'differs from . . . common parlance.' " (*Bland*, *supra*, 28 Cal.4th at p. 334.) Thus, we must reject their claim that the trial court erred when it failed to sua sponte define the phrase for the jury. (See *ibid.*)

54

**F.** *Failure to Instruct on Heat of Passion Voluntary Manslaughter and Unreasonable Self-Defense*

Defendants contend that the trial court erred when it failed to sua sponte instruct the jury on heat of passion voluntary manslaughter and unreasonable self-defense based on David's testimony that Richard said the victim was "mugging" him and he thought the victim was reaching for a gun or a knife. The Attorney General counters that the evidence did not support voluntary manslaughter instructions and that any error was harmless because the jury found defendants guilty of premeditated and deliberate first degree murder.

**1. Trial Court Proceedings**

During a conference on jury instructions, the trial court recounted that it had asked defendants at the beginning of trial whether they sought instruction on lesser included offenses, and defendants "did not because it was a[n] . . . 'all or nothing' . . . case." The court explained that the defense theory was that defendants "were not in their car; so you can't have a second degree or something of that nature when they didn't do it." The court stated that it raised the issue of lesser included offenses again at the conclusion of the evidence, and defendants indicated that "they did not want lessers."

The prosecution interjected that it "appreciate[d] that this is . . . all or nothing," but asked, "to make sure we're covered," whether there "couldn't . . . be a factual scenario, just hypothetically, where the jurors believe[] there's involvement [by defendants] and that there was some kind of provocation by the victim." The court responded that it did not identify any lesser included offenses in this case that it was required to give sua sponte. The court stated that it intended to instruct on self-defense, "which would make it not guilty," and that it was "still open to . . . including any lesser." When asked if defendants had anything to add, defendants declined.

The trial court instructed the jury on murder and first degree murder. The first degree murder instructions presented two theories: willful, deliberate, and premeditated

55

murder and intentionally discharging a firearm from a vehicle with the intent to kill. The court did not instruct on self-defense or on any lesser included offenses, including heat of passion voluntary manslaughter or imperfect self-defense.

### 2. Legal Principles

"California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter." (*People v. Rios* (2000) 23 Cal.4th 450, 460 (*Rios*).) Murder is "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Malice exists, if at all, only when an unlawful homicide was committed with the 'intention unlawfully to take away the life of a fellow creature' (§ 188), or with awareness of the danger and a conscious disregard for life (*ibid.*; [citations])." (*Rios*, *supra*, at p. 460.)

Manslaughter, on the other hand, is "the unlawful killing of a human being without malice." (§ 192.) "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense." ' " (*People v. Blakely* (2000) 23 Cal.4th 82, 87-88.) Heat of passion voluntary manslaughter occurs when the perpetrator " ' "actually, subjectively, kill[s] under the heat of passion," ' " and, objectively, " 'th[e] heat of passion [is] such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.' " (*People v. Rogers* (2009) 46 Cal.4th 1136, 1168.) A perpetrator kills in unreasonable self-defense when he or she " 'holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury.' " (*People v. Elmore* (2014) 59 Cal.4th 121, 134 (*Elmore*); see *ibid.*, fn. omitted [stating that unreasonable self-defense "is most accurately characterized as an *actual* but unreasonable belief"].)

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty

only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense. [Citation.] 'The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence.' [Citation.] In light of this purpose, the court need instruct the jury on a lesser included offense only '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of' the lesser offense. [Citation.]" (*People v. Shockley* (2013) 58 Cal.4th 400, 403-404.) "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense. [Citations.]" (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight" (*People v. Moye* (2009) 47 Cal.4th 537, 556 (*Moye*)), and the determination "must be made without reference to the credibility of that evidence" (*People v. Marshall* (1996) 13 Cal.4th 799, 847 (*Marshall*)). "The testimony of a single witness . . . can constitute substantial evidence requiring the court to instruct on its own initiative." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

"The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense. [Citation.]' [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155 (*Breverman*); see also *id.* at p. 149 ["in a murder prosecution," a court's sua sponte duty "includes the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied"].)

We review de novo a trial court's decision not to instruct on a lesser included

57

offense.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

### 3.  Analysis

Beginning with defendants' claim that the trial court erred when it failed to sua sponte instruct the jury on heat of passion voluntary manslaughter, we conclude that there was not substantial evidence that when Richard shot Mendoza, he "acted while under 'the actual influence of a strong passion' [citation] in response to legally sufficient provocation, such as caused him to ' "act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " (*Moye*, *supra*, 47 Cal.4th at p. 553.)

*Moye* is instructive.  There, the defendant testified that "he responded to [the victim's] attack with the baseball bat by grabbing the bat from him and using it to defend himself from [the victim's] continuing advances." (*Moye*, *supra*, 47 Cal.4th at p. 553.) The California Supreme Court concluded that "the thrust of [the] defendant's testimony . . . was self-defense—both reasonable self-defense . . . and unreasonable or imperfect self-defense" and that "[t]here was insubstantial evidence at the close of the evidentiary phase to establish that [the] defendant 'actually, subjectively, kill[ed] under the heat of passion.' " (*Id.* at p. 554.)  The court distinguished the case from *Breverman*, where "there was affirmative evidence that the defendant panicked in the face of an attack on his car and home by a mob of angry men and had come out shooting, and continued shooting, even after the group had turned and ran." (*Id.* at p. 555.)  In contrast, the court found that the defendant's actions in *Moye* were "deliberate[]." (*Ibid.*)

Here, David testified that Richard told him that "as they were coming out, . . . they s[aw] a car . . . at [a] stop sign, far away.  And he's coming up and he stops right there, and Richard said he sees him reach down, and so he started shooting at him because he thought he was reaching for a gun."  David stated that Richard also said, "When it went forward, that car takes off and comes next to 'em and looks at 'em, and that's when he said that he saw him reaching down there, and -- um, down to the bottom of the feet, and

58

-- so that's why he started shooting at him." David testified that Richard said he thought the driver, Mendoza, had a gun or a knife. David also stated that Richard said that "[w]hen the . . . driver pulled up next to the car he was mugging Richard, [*sic*] pulled out his gun and started shooting at him." "[M]ugging" means "[g]iving a dirty look, like you're angry at them." When asked about Richard's demeanor when he was telling David what happened, David testified that Richard was "just letting him know, informing [him] of what happened."

As in *Moye*, there was insubstantial evidence in the record that Richard " ' "act[ed] rashly" ' " or " ' "from . . . passion rather than from judgment" ' " when he shot Mendoza. (*Moye*, *supra*, 47 Cal.4th at p. 553.) Rather, Richard's statements to David evince a "deliberate[]" decision to shoot Mendoza because Richard thought Mendoza was reaching for a gun or a knife and Mendoza was giving Richard angry looks. (*Id.* at p. 555.) Heat of passion, in contrast, is "a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

However, whether sua sponte instruction on unreasonable self-defense was required is a closer question. Mindful that we are to determine "bare legal sufficiency" (*Moye*, *supra*, 47 Cal.4th at p. 556), "without reference to the credibility of the evidence" (*Marshall*, *supra*, 13 Cal.4th at p. 847), we conclude that David's testimony regarding Richard's statements "present[ed] evidence that [Richard] perceived that [Mendoza] . . . posed a risk of imminent peril" and that Richard "acted out of fear" (*Simon*, *supra*, 1 Cal.5th at pp. 133-134). In *Simon*, the California Supreme Court found the record "devoid of evidence" that the defendant acted in unreasonable self-defense. (*Id.* at p. 134.) There, the defendant initiated the aggressive interactions by cursing at the victim, the victim was unarmed, the defendant did not testify, "and there [was] no evidence [the defendant] ever told anyone that he acted out of fear." (*Ibid.*)

59

Here, in contrast, there was evidence that Richard told David that he shot Mendoza because he thought Mendoza was reaching for a gun. Although the Attorney General correctly asserts that the doctrine of imperfect self-defense " 'may not be invoked by a defendant who, through his [or her] own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created the circumstances under which his [or her] adversary's attack or pursuit is legally justified" (*People v. Enraca* (2012) 53 Cal.4th 735, 761), there is no evidence that defendants had already initiated an assault or the commission of a felony when Mendoza allegedly reached for something causing Richard to think he was going for a weapon. Thus, based on David's testimony regarding Richard's statements about the incident, we conclude under the guidance of the California Supreme Court in *Simon* that the trial court should have instructed the jury on unreasonable self-defense.

### 4. Prejudice

"In noncapital cases, 'the rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law.' [Citation.] As such, 'in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under . . . *Watson*.' " (*Beltran*, *supra*, 56 Cal.4th at p. 955.) " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*Beltran*, *supra*, at p. 955.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Id.* at p. 956.)

60

Preliminarily, we note the parties' dispute regarding whether the jury's finding that defendants committed first degree murder demonstrates that the trial court's failure to instruct on unreasonable self-defense was harmless. The Attorney General argues that had the jury "thought [Richard] acted rashly because he had an actual belief in his need to defend himself, it would not have found that [defendants] acted with premeditation and deliberation and it could have returned . . . verdict[s] of second-degree murder." Defendants counter that courts have held that a verdict of premeditated and deliberate first degree murder does not establish harmlessness in these circumstances.

There is a split of authority regarding whether a jury's finding that a defendant committed premeditated and deliberate first degree murder renders a trial court's failure to instruct on voluntary manslaughter harmless. (Compare *People v. Peau* (2015) 236 Cal.App.4th 823, 830-832 (*Peau*) with *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1487-1488.) We need not weigh in on the issue, however, because the jury in this case was instructed on *two* theories of first degree murder—premeditated and deliberate first degree murder and first degree murder committed by discharging a firearm at a motor vehicle with the intent to kill—and we have no way of knowing on which theory each of the jurors relied. Thus, harmlessness is not demonstrated by the verdicts here because a finding that Richard discharged a firearm from the Jeep with the intent to kill Mendoza is not " 'manifestly inconsistent' " with a finding that Richard acted in unreasonable self-defense. (*Peau*, *supra*, 236 Cal.App.4th at p. 831; see *Elmore*, *supra*, 59 Cal.4th at p. 134 [" ' "A person who actually believes in the need for self-defense necessarily believes he is acting lawfully." ' "].)

Based on our careful review of the record, however, we conclude that " 'there is no reasonable probability' " that the trial court's failure to instruct the jury on unreasonable self-defense " 'affected the result.' " (*Beltran*, 56 Cal.4th at p. 956.) David's testimony that supported an unreasonable self-defense instruction was directly and conclusively contradicted by video surveillance footage, and the footage provided

61

strong evidence of premeditation and deliberation.

David testified that Richard told him that he and James saw Mendoza's vehicle at a faraway stop sign and that Mendoza's car "*went forward . . . and comes next to 'em* and looks at 'em, and that's when [Richard] said that he saw [Mendoza] reaching" for a weapon. (Italics added.) David also stated that Richard told him that when Mendoza "*pulled up next to the car* he was mugging Richard." (Italics added.) But the surveillance footage showed that immediately before the shooting, Mendoza's vehicle and defendants' Jeep were both traveling southbound with Mendoza's vehicle a short distance *ahead* of the Jeep. The Jeep was traveling behind Mendoza's car with its lights off. Less than a second later, the footage showed what appeared to be two shots fired from the Jeep toward Mendoza's vehicle. Defendants' Jeep was in Mendoza's blind spot when the first shot was fired. And consistent with the surveillance footage, one gunshot hit Mendoza in the back; the other struck Mendoza's left upper arm. Thus, the surveillance footage rendered Richard's self-serving statements that Mendoza "comes next to 'em" when Richard saw Mendoza reach for a weapon and that Mendoza "pulled up next to the[m]" when he began "mugging" Richard not credible. Rather, the surveillance footage showed that defendants followed Mendoza and Richard shot at him from behind, which proved the absence of unreasonable self-defense.

Moreover, the surveillance footage provided strong evidence of premeditation and deliberation. The footage showed defendants' Jeep traveling back and forth on the same neighborhood streets for a half hour. The footage was consistent with Richard's statement to David that he and James went to "the back streets to see if they can find anyone, anyone being Sureños." Approximately eight minutes before the shooting, the Jeep began traveling with its lights turned off. When the shooting occurred, the Jeep was driving in Mendoza's blind spot with its lights off. This evidence demonstrated that the killing was " ' "thought over in advance" ' " and was carefully weighed " 'in forming a course of action.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

For these reasons, based on our careful review of the record, we determine it is not " 'reasonably probable a more favorable result would have been obtained' " had the trial court instructed the jury on unreasonable self-defense.  (*Beltran*, *supra*, 56 Cal.4th at p. 955.)  "[T]he evidence supporting the [first degree murder verdicts] is so *relatively* strong, and the evidence supporting [unreasonable self-defense] is so *comparatively* weak, that there is no reasonable probability" that the court's failure to instruct on unreasonable self-defense " 'affected the result.' "  (*Id.* at p. 956.)

### G.    *Calcrim No. 520*

In a related claim, defendants contend that the trial court erred because the instruction on murder with malice aforethought did not require the prosecution to prove the absence of provocation and unreasonable self-defense in order to establish the element of malice.  (Bold and capitalization omitted.)  Relying on *Mullaney v. Wilbur* (1975) 421 U.S. 684, 703 (*Mullaney*) and *Rios*, *supra*, 23 Cal.4th at pages 454, 461-462, defendants argue that given the evidence that Richard thought Mendoza was reaching for a gun and was glaring at him, "the prosecution had the burden of proving that [provocation and unreasonable self-defense] *were lacking* in order to establish that malice was present."

### 1.  Trial Court Proceedings

Apparently using CALCRIM No. 520,[14] the pattern instruction on first and second degree murder with malice aforethought, the trial court instructed the jury as follows: "The defendants are charged with murder.  The defendants are charged in count 1 with murder, Penal Code section 187.  To prove the defendant is guilty of this crime the People must prove:  [¶]  1, the defendant committed an act that caused the death of another person; and,  [¶]  2, when the defendant acted he had a state of mind called

---

[14] As noted above, the trial court's written jury instructions are not in the record on appeal.  The court's instruction on murder with malice aforethought tracks CALCRIM No. 520.

malice aforethought. [¶] There are two kinds of malice aforethought. Express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if: [¶] 1, he intentionally committed an act; [¶] 2, the natural and probable consequences of the act were dangerous to human life; [¶] 3, at the time he acted he knew his act was dangerous to human life; and, [¶] 4, he deliberately acted with conscious disregard to human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that caused death is committed. It does not require deliberation or the passage of any particular period of time. [¶] An act causes death if the death is a direct, natural and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen and nothing unusual intervenes. [¶] In deciding whether natural [*sic*] and probable consider all of the circumstances established by the evidence. If you decide a defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in the first degree murder instruction."

### 2. Forfeiture

The Attorney General contends that defendants' claim has been forfeited by their failure to object to the murder instruction below. However, "failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected. (§ 1259; [citation].) Here, [defendants] claim[] that the flawed instruction[] deprived [them] of due process, and because this would affect [their] substantial rights if true, [the] claim is not forfeited." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579-580 (*Mitchell*).)

### 3. Standard of Review

"An appellate court reviews the wording of a jury instruction de novo and assesses

whether the instruction accurately states the law.  [Citation.]  In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution.  [Citations.]  The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'  [Citation.]" (*Mitchell*, *supra*, 7 Cal.5th at p. 579.)

### 4. Analysis

In *Mullaney*, the Supreme Court held that a Maine law that required a defendant to establish by a preponderance of the evidence that he or she acted in the heat of passion was unconstitutional.  (*Mullaney*, *supra*, 421 U.S. at p. 703.)  The Supreme Court determined that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case."  (*Id.* at p. 704; see also *Patterson v. New York* (1977) 432 U.S. 197, 215 ["*Mullaney* . . . held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense"].)

In *Rios*, the California Supreme Court held that "neither heat of passion nor [unreasonable] self-defense is an element of voluntary manslaughter that the People must affirmatively prove beyond reasonable doubt in order to obtain a conviction for that offense."  (*Rios*, *supra*, 23 Cal.4th at p. 454.)  Rather, "where murder liability is at issue, evidence of heat of passion or [unreasonable] self-defense bears on whether an intentional or consciously indifferent criminal homicide was malicious, and thus murder, or nonmalicious, and thus the lesser offense of voluntary manslaughter.  In such cases, the People may have to prove the absence of provocation, or of any belief in the need for self-defense, in order to establish the malice element of murder."  (*Ibid.*)  "[I]n a murder

65

case, unless the People's own evidence suggests that the killing may have been provoked or in honest response to perceived danger, it is the defendant's obligation to proffer some showing on these issues sufficient to raise a reasonable doubt of his guilt of murder." (*Id.* at pp. 461-462, italics omitted.) "If the issue of provocation or [unreasonable] self-defense is thus 'properly presented' in a murder case [citation], the *People* must prove *beyond reasonable doubt* that these circumstances were *lacking* in order to establish the murder element of malice." (*Id.* at p. 462.) Thus, "where the evidence warrants, a murder jury must hear that provocation or [unreasonable] self-defense negates the malice necessary for murder." (*Id.* at p. 463, fn. 10.)

Here, for the reasons stated above (see *ante* at pp. 58-59), there was not substantial evidence that Richard shot Mendoza in the heat of passion—that Richard " ' "act[ed] rashly" ' " or " ' "from . . . passion rather than from judgment" ' " (*Moye*, *supra*, 47 Cal.4th at p. 553). However, based on David's testimony that Richard told him that he saw Mendoza "reach down, and so he started shooting him because he thought he was reaching for a gun," we conclude there was some evidence that Richard shot Mendoza in "[the] actual but unreasonable belief" in the need to defend himself "against imminent peril to life or great bodily injury." (*Elmore*, *supra*, 59 Cal.4th at p. 134, fn. omitted, italics omitted.) Thus, because "the People's own evidence suggest[ed] that the killing may have been . . . in honest response to perceived danger," the trial court was obligated to instruct the jury that the prosecution had to prove the absence of an actual belief in the need for self-defense in order to establish the murder element of malice. (*Rios*, *supra*, 23 Cal.4th at p. 454.) Given that none of the other instructions conveyed this requirement to the jury, we conclude there is a " 'reasonable likelihood' " that the jury may have misapplied the court's instruction on murder with malice aforethought. (*Mitchell*, *supra*, 7 Cal.5th at p. 579.)

### 5. Prejudice

"Instructional error regarding the elements of the offense requires reversal of the

judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201.) " 'In deciding whether a trial court's misinstruction on an element of an offense is prejudicial to the defendant, we ask whether it appears " ' "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " ' [Citations.]" (*People v. Wilkins* (2013) 56 Cal.4th 333, 350.) In other words, the error is harmless under the *Chapman*[15] standard if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." (*Neder v. United States* (1999) 527 U.S. 1, 18 (*Neder*); see also *People v. Mil* (2013) 53 Cal.4th 400, 417.) "Of course, safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, *where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding*—it should not find the error harmless." (*Neder*, *supra*, at p. 19, italics added.)

Having carefully reviewed the entire record, including the video surveillance footage, we conclude beyond a reasonable doubt that the trial court's failure to instruct the jury that the prosecution had to prove the absence of unreasonable self-defense in order to establish the element of malice was harmless because "the jury verdict would have been the same absent the error." (*Neder*, *supra*, 527 U.S. at p. 19.)

Richard's self-serving statements to David that he saw Mendoza reach down for what he thought was a gun when Mendoza's car "went forward . . . and comes next to 'em" and that Mendoza was glaring at Richard when Mendoza's car "pulled up next to the[m]," were entirely discredited by the video surveillance footage showing defendants'

---

[15] *Chapman v. California* (1967) 386 U.S. 18.

Jeep approach Mendoza's car *from behind* with its lights off.[16]  The footage shows a flash next to defendants' vehicle as it drove in Mendoza's blind spot.  Indeed, Mendoza was shot in the left upper back and left upper arm.  In addition, the surveillance footage shows defendants' Jeep traveling back and forth in the neighborhood for a half hour before the shooting.  The surveillance footage thus corroborated David's testimony that Richard told him that prior to the shooting, he and James went to "the back streets to see if they can find anyone, anyone being Sureños."  Taken together, this evidence provided overwhelming proof of malice.

Moreover, defendants did not contest the element of malice or that this was a murder.  Defendants' sole theory at trial was that they were not the ones who killed Mendoza.  Richard's counsel argued, "This is a case of whodunit, not that [Mendoza] died, the horrific way that he died and what [the prosecution] talked about, how he was stalked or hunted. . . .  It was horrific, but we're here to say who did it?  Who was in the black Jeep?"  Later, when discussing that there was no DNA evidence linking Richard to the Jeep, counsel asserted that "the reason why the car is critical is we know from video the occupants of that car are the murderers."  Richard's counsel consistently referred to the incident as "the murder" and acknowledged that "the hunting [for Sureños] started at 3:00 o'clock."  Similarly, counsel for James argued that "this was a case of whodunit."  James's counsel stated, "We know what happened to . . . Mendoza," but "[t]he identity [of the driver] must be proven and that's the issue."  James's counsel also consistently

---

[16]  As we stated above, David testified that Richard told him that "as they were coming out [of the neighborhood], . . . they see a car . . . at [a] stop sign, far away."  As "he's coming up, . . . he stops right there, and Richard said he sees him reach down, and so he started shooting at him because he thought he was reaching for a gun."  Richard stated that "[w]hen it went forward, that car takes off and comes next to 'em and looks at 'em, and that's when [Richard] said that he saw him reaching down there, . . .  down to the bottom of [his] feet, and -- so that's why he started shooting at him."  Richard also told David that "when the other driver pulled up next to the car he was mugging Richard, [*sic*] pulled out his gun and started shooting at him."

68

referred to the crime as "murder." And James's counsel argued that "if you believe that James knew what was going on, that does not make him a murderer."

Nor did defendants present evidence that supported Richard's statement to David that he saw Mendoza reach down for what he thought was a gun as Mendoza's car pulled up next to defendants' vehicle. (See *Neder*, *supra*, 527 U.S. at p. 19.)

Thus, given the record here, where the scant evidence of unreasonable self-defense was entirely discredited by surveillance footage, there was overwhelming evidence of malice, defendants did not contest the element of malice or that the killing was a murder, and defendants did not "raise[] evidence sufficient to support a contrary finding," we conclude that the trial court's failure to instruct the jury that the prosecution had to prove that unreasonable self-defense was lacking in order to establish the element of malice was harmless beyond a reasonable doubt. (*Neder*, *supra*, 527 U.S. at p. 19.)

**H.**     ***Ineffective Assistance of Counsel for Failure to Request Third-Party Culpability Instruction***

Defendants contend that their counsel were ineffective for failing to request instruction on third-party culpability. Defendants assert that counsel's failure to request a third-party culpability instruction "deprive[d] the jury of a framework for considering the significance of the most powerful pro-defense evidence," namely, that Isaac killed Mendoza. The Attorney General counters that defendants have not established counsel's deficient performance or prejudice from the lack of instruction.

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) Regarding prejudice, a "defendant must show that there is a reasonable probability"—meaning "a

probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) Prejudice requires a showing of "a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland*, *supra*, at p. 697.)

We determine that defendants have failed to establish they were prejudiced by counsel's failure to request an instruction on third-party culpability. The California Supreme Court has "noted that [such] instructions add little to the standard instruction on reasonable doubt" and has "held that even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. [Citations.]" (*People v. Hartsch* (2010) 49 Cal.4th 472, 504.)

In *People v. Earp* (1999) 20 Cal.4th 826, 887 (*Earp*), the California Supreme Court found no prejudice from the trial court's refusal to give a third-party culpability instruction because the jury was instructed that the prosecution had to prove the defendant's guilt beyond a reasonable doubt and "the jury knew from defense counsel's argument the defense theory that Dennis Morgan, not defendant, had committed the crimes. Under these circumstances, it is not reasonably probable that had the jury been given defendant's proposed [third-party culpability] instruction, it would have come to any different conclusion in this case." (*Ibid.*)

The same holds true here. The jury was fully instructed on the beyond a reasonable doubt standard of guilt and was told that "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, they [*sic*] are entitled to an acquittal and you must find them [*sic*] not guilty." The court instructed that whenever it told the jury that

the prosecution had to prove something, it "mean[s] they must prove it beyond a reasonable doubt." The court also instructed the jury fully on circumstantial evidence, including that before the jury could "rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty."

In addition, "the jury knew from defense counsel's argument[s] the defense theory that [Isaac], not defendant[s], had committed the [murder]." (*Earp*, *supra*, 20 Cal.4th at p. 887.) Both counsel argued that the case was a "whodunit" and that the prosecution had not proved the identity of the individual(s) in the Jeep. Counsel for Richard argued, "Why wasn't Isaac the prime suspect? He's the owner of the Jeep. . . . He's the only person seen driving the Jeep after the murder." And counsel for James argued at length regarding "the evidence that points to Isaac" and that David had a motive to lie to protect Isaac.

"Under these circumstances, it is not reasonably probable that had the jury been given [a third-party culpability] instruction, it would have come to any different conclusion in this case." (*Earp*, *supra*, 20 Cal.4th at p. 887.) Accordingly, defendants have failed to establish counsel were ineffective in failing to request a third-party culpability instruction. (See *Strickland*, *supra*, 466 U.S. at pp. 687, 694.)

**I.** *Unstayed Sentence on Count 2 Violated Section 654*

Defendants contend that the trial court violated section 654 when it did not stay a three-year consecutive term imposed for defendants' active participation in a criminal street gang (count 2). The Attorney General concedes that the three-year term on count 2 must be stayed because defendants were punished "for the underlying felonious conduct." We concur.

Section 654, subdivision (a) provides in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case

71

shall the act or omission be punished under more than one provision." The California Supreme Court has " 'consistently held that [section 654] bars imposing [multiple] sentences for a single act or omission, even though the act or omission may violate more than one provision of the Penal Code. . . . "[E]xecution of the sentence for one of the offenses must be stayed.' [Citations.]" (*People v. Mesa* (2012) 54 Cal.4th 191, 195 (*Mesa*).)

Relevant here, "[s]ection 654 applies where the 'defendant stands convicted of both (1) a crime that requires, as one of its elements, the intentional commission of an underlying offense, and (2) the underlying offense itself.' [Citation.]" (*Mesa, supra*, 54 Cal.4th at p. 198.) Consequently, in the context of the gang crime, " 'section 654 precludes multiple punishment for both (1) [the gang crime], one element of which requires that the defendant have "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of th[e] gang" [citation], and (2) the underlying felony that is used to satisfy this element of [the gang crime].' [Citation.]" (*Id.* at pp. 197-198.)

Here, as the Attorney General concedes, Mendoza's murder was " 'the underlying felony' " that the prosecution used to prove the gang offense's element that defendants promoted, furthered, or assisted felonious criminal conduct by Norteño members. (*Mesa, supra*, 54 Cal.4th at p. 198.) Thus, section 654 requires that the term for count 2 be stayed. (*Id.* at pp. 197-198.)

## J.     Dueñas *Claims*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendants contend that the trial court's imposition of a $10,000 restitution fine (§ 1202.4, subd. (b)), an $80 court operations assessment (§ 1465.8), a $60 court facilities assessment (Gov. Code, § 70373), and a $129.75 criminal justice administration fee[17] violated defendants'

_____

[17] The trial court did not specify whether the criminal justice administration fee was imposed under Government Code section 29550, 29550.1, or 29550.2.

due process rights because the court did not determine defendants' ability to pay. Defendants ask this court to reverse the assessments and fee and to stay the execution of the restitution fines "unless and until the prosecution proves [defendants] ha[ve] the present ability to [them]." Defendants also contend that if this court finds their *Dueñas* claims forfeited, they received ineffective assistance of counsel. The Attorney General asserts that because the matter must be remanded for resentencing, defendants' *Dueñas* claim can be raised below.

### 1. Trial Court Proceedings

The trial court ordered each defendant to serve 25 years to life on count 1 plus 25 years to life for the firearm enhancement consecutive to a three-year term on count 2. As to each defendant, the court imposed a $10,000 restitution fine, an $80 court operations assessment, a $60 court facilities assessment, and a $129.75 criminal justice administration fee. Defendants did not object.

### 2. *Dueñas*

In *Dueñas*, the defendant at sentencing requested a hearing to determine her ability to pay various amounts that were imposed by the trial court. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1162.) At a subsequent ability-to-pay hearing the court reviewed the defendant's "uncontested declaration concerning her financial circumstances." (*Id.* at p. 1163.) The court waived attorney's fees based on the defendant's indigence but rejected her constitutional claim that due process required the court to consider her ability to pay other fines and assessments, including a minimum restitution fine under section 1202.4, a $40 court operations assessment under section 1465.8, and a $30 court facilities assessment under Government Code section 70373. (*Dueñas*, *supra*, at p. 1163; see *id*. at p. 1169.)

On appeal, the *Dueñas* court observed that the purpose of the $40 assessment under section 1465.8 is "[t]o assist in funding court operations" (§ 1465.8, subd. (a)(1)), and that the purpose of the $30 assessment under Government Code section 70373 is

73

"[t]o ensure and maintain adequate funding for court facilities" (Gov. Code, § 70373, subd. (a)(1)).  Regarding such "fee-generating statutes" and their impact on indigent defendants, the *Dueñas* court stated that " '[c]riminal justice debt and associated collection practices can damage credit, interfere with a defendant's commitments, such as child support obligations, restrict employment opportunities and otherwise impede reentry and rehabilitation. . . .'  [¶]  These additional, potentially devastating consequences suffered only by indigent persons in effect transform a funding mechanism for the courts into additional punishment for a criminal conviction for those unable to pay." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1165, 1168.)  Based primarily on a trio of cases—*Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660—the *Dueñas* court concluded that imposition of the court operations assessment and court facilities assessment without a determination of the defendant's ability to pay was "fundamentally unfair" and violated due process under the federal and California Constitutions.  (*Dueñas*, *supra*, at p. 1168.)

Regarding restitution fines, the *Dueñas* court further stated that a wealthy defendant who successfully completes probation would have an absolute right to have the charges against the defendant dismissed under section 1203.4, subdivision (a)(1). (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1170, 1171.)  An indigent probationer, on the other hand, who could not afford the mandatory restitution fine, would have to persuade the trial court that dismissal of the charges and relief from the penalties of the offense were in the interest of justice.  (*Ibid.*, citing § 1203.4, subd. (a)(1).)  The *Dueñas* court found that "[t]he statutory scheme thus results in a limitation of rights to those who are unable to pay," and that section 1202.4 is "not a substitute for due process."  (*Dueñas*, *supra*, at p. 1171, fn. omitted.)  The *Dueñas* court concluded that the execution of a restitution fine under section 1202.4 "must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, at p. 1164.)

74

### 3. Forfeiture

The Courts of Appeal have reached different conclusions regarding whether a due process claim under *Dueñas* is forfeited if the defendant failed to object in the trial court to the imposition of the restitution fine, the court operations assessment, the court facilities assessment, or the criminal justice administration fee. (See, e.g., *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 197, 206 [Dueñas claim forfeited]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1031-1034 [due process objection based on *Dueñas* not forfeited]; *People v. Santos* (2019) 38 Cal.App.5th 923, 932 [claim based on *Dueñas* not forfeited].) We determine that defendants forfeited their ability-to-pay claim.

The trial court imposed the maximum statutorily authorized restitution fine of $10,000 under section 1202.4. Section 1202.4 provides that "[t]he restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense." (*Id.*, subd. (b)(1).) The statute sets forth a minimum and maximum fine. (*Ibid.*) Section 1202.4 further provides that "[t]he court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine." (*Id.*, subd. (c).) However, "*[i]nability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the*" statutory minimum fine. (*Ibid.*, italics added.) Specifically, in setting the restitution fine in excess of the statutory minimum, "the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay . . . ." (*Id.*, subd. (d).) The defendant "bear[s] the burden of demonstrating" an inability to pay. (*Ibid.*) "Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required." (*Ibid.*)

Significantly, "a defendant forfeits on appeal any 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' in the

75

absence of objection below. [Citations.]" (*People v. Wall* (2017) 3 Cal.5th 1048, 1075.) In this case, by failing to object below, defendants forfeited their claims that the trial court failed to exercise its discretion to determine their ability to pay. (See *People v. Nelson* (2011) 51 Cal.4th 198, 227 [ability-to-pay claim forfeited where the defendant could have objected at sentencing "if he believed inadequate consideration was being given to" the ability-to-pay factor for the restitution fine].)

Defendants argue that their challenge to the restitution fine "should be deemed preserved for review" because before *Dueñas* was decided, courts "had . . . rejected due process challenges to imposition of restitution fines without a finding of ability to pay." (Italics and capitalization omitted.) However, as stated, subdivision (d) of section 1202.4 mandates that "the court . . . consider any relevant factors, including . . . the defendant's inability to pay" in setting a restitution fine above the statutory minimum. Because the trial court imposed the maximum restitution fine, defendants were "obligated to object to the amount of the fine and demonstrate [their] inability to pay anything more than the [statutory] minimum. Such an objection would not have been futile under governing law at the time of his sentencing hearing. [Citations.]" (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.) In other words, "even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4 . . .) expressly permitted such a challenge. [Citation.]" (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*).) "Thus, even if *Dueñas* was unforeseeable (a point on which we offer no opinion), under the facts of this case [defendants] forfeited any ability-to-pay argument regarding the restitution fine by failing to object." (*Ibid.*)

We also determine that defendants forfeited their ability-to-pay claims regarding the $80 court operations assessment, the $60 court facilities assessment, and the $129.75 criminal justice administration fee. "[I]f [defendants] chose not to object to a $10,000 restitution fine based on [their] inability to pay, [they] surely would not complain on

76

similar grounds regarding an additional [$269.75] in fees." (*Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033.)

### 4. Ineffective Assistance of Counsel

Defendants contend that their trial counsel provided ineffective assistance by failing to object to the restitution fine, the court operations assessment, the court facilities assessment, and the criminal justice administration fee.

As stated above, "a defendant claiming the ineffective assistance of counsel is required to show both that counsel's performance was deficient and that counsel's errors prejudiced the defense." (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1105.) Regarding prejudice, a "defendant must show that there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) We conclude that defendants have failed to demonstrate they were prejudiced by counsel's failure to object to the fine and assessments.

"[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." (*People v. Frye* (1994) 21 Cal.App.4th 1483, 1487 (*Frye*).) This includes a defendant's ability to earn prison wages. (*Ibid.*)

Here, defendants were each sentenced to serve two terms of 25 years to life,[18] and the trial court could consider defendants' ability to earn prison wages while serving their indeterminate life sentences. (See *Frye*, *supra*, 21 Cal.App.4th at p. 1487.) On this record, defendants have not shown "a reasonable probability" that the trial court would have reduced or stayed the fine, the assessments, or the fee had trial counsel objected to

---

[18] We do not include the trial court's imposition of a consecutive three-year term on count 2 because, for the reasons stated above, the sentence on count 2 should have been stayed.

77

them and requested a hearing.  (*Strickland*, *supra*, 466 U.S. at p. 694.)  Thus, we reject defendants' claims that their trial counsel provided ineffective assistance when they failed to object to the trial court's imposition of the restitution fine, the court operations assessment, the court facilities assessment, and the criminal justice administrative fee on the basis of defendants' inability to pay.

## IV.    DISPOSITION

The judgments are ordered modified by staying the three-year terms imposed on count 2 for active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)) pursuant to Penal Code section 654.  As so modified, the judgments are affirmed.  The trial court shall prepare amended abstracts of judgment and forward them to the California Department of Corrections and Rehabilitation.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

ELIA, J.

***People v. Guerrero et al.***
**H045752**